299 So.2d 364 (1974)
Beldon E. FOX, Plaintiff-Appellee,
v.
AMERICAN STEEL BUILDING COMPANY, INC., Defendant-Appellant.
No. 4510.
Court of Appeal of Louisiana, Third Circuit.
August 6, 1974.
Rehearing Denied August 21, 1974.
*366 Armentor & Wattigny, by Gerard B. Wattigny, New Iberia, for defendant-appellant.
Mestayer & Simon, by Ray F. Mestayer, New Iberia, for plaintiff-appellee.
Before HOOD, CULPEPPER and MILLER, JJ.
HOOD, Judge.
Beldon E. Fox, d/b/a The Red Fox Machine and Supply Company, has sued American Steel Building Company, Inc., to recover damages sustained by Fox and allegedly caused by (1) redhibitory defects in a "stop" mechanism on an overhead crane system designed and fabricated by American; and (2) redhibitory vices in and the failure of door panels on a metal building purchased from American to withstand a wind storm. The trial judge rendered judgment in favor of plaintiff. Defendant American appealed.
A separate suit was instituted by American against Fox to recover the purchase price of a new crane or hoist and the price of five replacement door panels for the above mentioned building, all of which allegedly were ordered by Fox. That case was consolidated for trial and appeal with the instant suit. The trial court rendered judgment in that case in favor of American, awarding it substantially the sum demanded. American appealed. Fox has answered the appeal.
The appeals in both of these consolidated cases have been argued and submitted. We are rendering a separate judgment in the companion suit on this date. See American Steel Building Company, Inc. v. Fox, 299 So.2d 377 (La.App.).
A number of issues are presented. The principal ones are whether there were defects in the design or manufacture of the building and of the stop mechanism on a crane system which American sold to Fox, and if so, whether those defects were proximate causes of the damages sustained by plaintiff.
Fox has owned and operated a machine shop in New Iberia, Louisiana, for at least 25 years. In November, 1969, he entered into a contract with American for the purchase of a truss type steel building, which he intended to erect and use in connection with his machine shop business. The building had a floor space of 54 feet by *367 200 feet, a height at the eaves of 32 feet, and a height at the peak of about 43 feet. Fox intended to install an overhead crane system in the building, so in addition to the materials which usually make up a building of that type, the contract also provided for the delivery of four heavy steel beams, each 200 feet long, those beams being equipment needed for the installation of such a crane system in the building. The structure was designed and fabricated by American, and it was warranted by American against failure due to defective materials or workmanship. The building was shipped to plaintiff and was erected for him in New Iberia by Dick Standridge, a metal building construction contractor.
After the erection of the building had been completed, it extended 200 feet east and west, with the south side of the building facing the Gulf of Mexico, about 20 or 30 miles away. There were five large openings in the walls of the building, each of which was 18 feet wide by 24 feet in height, and each such opening was equipped with two sliding panels or doors which could be moved to open or close the opening. Each of these door panels was 9 feet wide and 24 feet high. Two of these large openings or doors were on the south side of the building, one was at the east end of it, one was at the west end, and the remaining opening or door was on the north side of the building.
At about the same time the above building was ordered, Fox also purchased from American an overhead crane system which was to be installed inside the building. This system, designed and manufactured by American, consisted in part of two hoists, each of which weighed about 1700 pounds and had a lifting capacity of five tons. The system was designed so that one of these hoists ordinarily would be used to lift and move objects in the north half of the building, and the other would be used to lift and move objects in the south half of it.
Four steel beams or "tracks," each of which was about 200 feet long, were installed overhead in the building, running east and west the full length of it. Immediately under those tracks, and suspended to them by trolleys, were two steel beams (referred to herein as "crane beams"), each of which ran north and south and was about 22 feet long. One of these crane beams extended from the center of the building to a point near the north wall, and the other extended from the center to a point near the south wall of the building. One five-ton hoist was suspended by trolleys under the crane beam which extended over the north half of the floor of the building, and the other hoist was suspended under the crane beam which extended over the south half of the building. The crane system was equipped with electric motors, by means of which the hoists could be moved from place to place in the building. The crane beams could be moved east and west along the overhead tracks from one end of the building to the other, and each hoist could be moved north and south on the crane beam from which it was suspended. All of the movements of the crane, including its lifting operations, were controlled by electric buttons in a control box, which was handled by the crane operator while he was on the floor of the building.
The crane system was installed in the building by Dick Standridge at or shortly after the time the erection of the building was completed.
On June 17, 1971, while the crane system was being used by plaintiff's employees, one of the five-ton hoists which comprised a part of that system ran off the end of the crane beam from which it was suspended, and it fell to the floor of the building, destroying the hoist and causing other damages. Fox ordered another hoist of that type from American, which was delivered on September 14, 1971, and was installed shortly thereafter.
On September 16, 1971, a wind storm struck the area in which plaintiff's machine shop was located, and during that storm five of the large sliding door panels *368 in the building which plaintiff purchased from American were destroyed. Fox ordered five new panels from American, identical to the ones which had been destroyed, and these replacement panels were delivered and have been installed.
American made a demand on Fox for payment of the price of the replacement hoist and the price of the five replacement door panels which had been ordered by plaintiff. Fox not only refused to pay the amounts demanded, but he instituted this suit on January 14, 1972, for the damages alleged to have been sustained by him as the result of both of the above mentioned accidents, that is, the fall of the hoist on June 17, 1971, and the failure of the door panels to withstand a wind storm on September 16, 1971. Plaintiff alleges that the destruction of the hoist, and other damages sustained as a result of the first accident, were caused by defects in the design and manufacture of a "stop" mechanism on the crane beam from which that hoist was suspended. He alleges that the destruction of the five door panels, and the damages which he sustained as a result of the second accident, were caused by redhibitory vices in the door panels. He contends that American was negligent in designing and fabricating the stop mechanism on the crane system, and in failing to disclose to plaintiff the vices in the door panels, and he seeks to recover from defendant the sum of $32,055.30, that being all of the damages he allegedly sustained as a result of both of the above mentioned incidents.
Defendant denies liability to plaintiff under either or both of the two alleged causes of action. It contends that there were no defects in the design or manufacture of any part of the crane system, and that the sole cause of the first accident was the negligence of one of plaintiff's employees in operating the hoist which was destroyed. It contends that there were no vices or defects in the door panels of the building which it sold to plaintiff, and that the destruction of five such panels on September 16, 1971, resulted from an "Act of God," that is, a windstorm which occurred on that date, involving winds which were in excess of the represented strength of the building.
The companion suit was instituted by American against Fox on February 23, 1972. In that suit American seeks to recover $4,023.97 from Fox for the hoist and door panels ordered by plaintiff.
The trial judge found that defendant was liable under both causes of action, and in this suit he rendered judgment in favor of plaintiff for the aggregate sum of $40,983.17. The award was itemized in the judgment as follows:

"1. Replacement hoist $ 2,225.95
 2. Cost of constructing of 2 cross-
 over devices 4,000.00
 3. Trucking bill 300.00
 4. Hiring of winch trucks 5,684.60
 5. Night watchman 937.92
 6. Cost of new door panels 1,678.90
 7. Labor for installation of new
 door panels 1,000.00
 8. Additional work on end panels 1,000.00
 9. Strengthening of door panels 3,357.80
10. Cost overrun on two winches 15,000.00
11. Attorney's fees 5,798.00
 ___________
 TOTAL: $40,983.17"

In the companion suit, the trial judge condemned Fox to pay to American the sum of $3,904.85, which included an award of $2,225.95 as the cost of the replacement hoist, and $1,678.90 for the new door panels.
Since the demands in these suits are based on two different causes of action, they will be discussed separately.

Defects in Crane System
Each of the crane beams from which a hoist was suspended was equipped with two "stop" mechanisms, one such "stop" being located at each end of the beam. These "stop" mechanisms were designed to prevent a hoist from running off the end of the beam and falling to the floor in the event the operator neglected to halt the movement of the hoist before it reached the end of the beam. All overhead crane *369 systems are equipped with "stops" at the ends of each crane beam as an important safety measure. Ordinarily the "stop" is attached rigidly to the crane beam, and it is designed so that it will never permit the hoist to run off the end of that beam.
Fox, however, frequently needed to lift objects which weighed more than five tons. To meet that need American designed and fabricated a special mechanism called a "crossover device," consisting principally of a stop mechanism which could be moved or released. Defendant supplied plaintiff with two of these devices. One was attached by four steel bolts to the end of one crane beam near the center of the building, and the other such device was attached in the same manner to the end of the other crane beam. These crossover devices enabled the crane operator to open or release the "stop" mechanism on that end of the crane beam, and then to move the hoist suspended from that beam across the center of the building onto the same crane beam which supported the other hoist. When a hoist was made to "crossover" from one crane beam to the other, both hoists would then be located side by side, suspended by trolleys under the same crane beam, and they could be used together to lift loads weighing up to ten tons. A hoist could not be made to "crossover" from one beam to the other, of course, unless the operator first caused the two crane beams to be lined up perfectly with each other. He then would have to release the "stop" in the "crossover device" on one crane beam, and thereafter cause the hoist suspended from that beam to travel across the center of the building onto the other crane beam.
The "crossover device," designed and manufactured by American, consisted, in part, of two steel arms or levers, each about 7 inches long, one of which was located on one side of the crane beam and one on the other side of it. These arms or levers were movable, but normally they hung down in such a position that if the hoist was moved toward the end of that crane beam where the crossover device was located, it would strike both of these levers. Immediately behind each lever was a steel "stop block," about 5 inches long, which was welded to the crossover device, and this stop block was designed to prevent the arm or lever next to it from yielding to the pressure of the hoist, and thus the stop blocks and the levers together prevented the hoist from running off the end of the beam. When the operator wanted to cause a hoist to "crossover" from one crane beam to the other, he could pull on a chain attached to the crossover device, and that would cause the two arms or levers to swing up out of the way of the hoist, and thus permit the hoist to travel beyond the end of that beam. Unless that chain was pulled, the above mentioned levers fell into their proper positions to prevent the hoist from running off the end of the beam.
On June 17, 1971, Wilton Thibodeaux, an employee of Fox, used one of the hoists to lift a rotary table, his purpose being to lift it from the floor, turn it over and lay it down on its other side. The rotary table was about two feet thick and four or five feet in diameter. It weighed between 8,000 and 10,000 pounds. After the table had been raised to a vertical position and lifted barely off the floor, it suddenly began falling in the direction of the center of the building, and caused the hoist to move along the crane beam from which it was suspended toward the center of the building and against the stop mechanism which formed a part of the "crossover device" at the end of that beam. Only one hoist was being used on that crane beam, so the two crane beams were not lined up with each other. Although the two levers which constituted a part of the stop mechanism in the "crossover device" were in their proper positions, the movement of the hoist nevertheless caused one "stop block" to be sheared off completely from the crossover device to which it had been welded. The entire crossover device then was pulled loose from the four bolts which held it to the crane beam. The stop mechanism in the crossover device thereupon was unable to prevent the hoist from traveling beyond *370 the end of the beam, and as a result thereof the hoist fell to the floor of the shop, a distance of about 25 feet. No one was injured, fortunately, but the hoist was totally destroyed as a result of that accident.
The day after this accident occurred, Fox ordered another hoist from defendant to replace the one which had been destroyed. The replacement hoist was delivered to Fox on September 14, 1971, and it was installed shortly thereafter. American designed, manufactured and installed a new "crossover device" to replace the one which had broken. The replacement cross-over device differed in some respects from the one which had failed previously.
Plaintiff contends that the stop mechanism in the crossover device was defective in design and in fabrication, and that these defects were the proximate cause of the accident. He contends that the "stop block" which was sheared off by the impact of the hoist had been improperly designed, and that the weld of that stop block to the crossover device was defective. He also contends that the crossover device was not properly designed in that the holes through which it was bolted to the crane beam were not adequately reinforced.
The evidence relating to the fall of and damage to the hoist consisted of the testimony of eye witnesses to the accident, the opinions of experts as to the adequacy of the stop mechanism, photographs, documents and technical codes and standards. There also was introduced in evidence the entire crossover device which failed, and the new crossover device which was supplied by American to replace the old one after the accident occurred.
The crane system was designed in such a manner that when the operator activated the control which caused the hoist to move along the crane beam, it moved at a speed of 80 feet per minute, that being the maximum speed it could travel under its own power. All parties apparently agree that this is a relatively slow speed. The operator of the crane testified however, that the controls had not been activated, and that the hoist was not moving under its own power at the time this accident occurred. Most of the eye witnesses felt that the hoist struck the stop device at its normal operating speed, that is, about 80 feet per minute, but one of them felt that it was traveling faster than that, and that it struck the stop device with greater force than would have been present had the hoist been moving under its own power.
Expert engineers called by plaintiff, after considering the weight of the hoist, the estimated speed at which it was traveling when it struck the stop mechanism, and the assumed deflection, deceleration or stopping distance of that mechanism, concluded that the stop mechanism on the crossover device was inadequate to prevent the hoist from running off the end of the beam. Other qualified engineers called by defendant considered the same factors and concluded that the stop mechanism was adequate. We, like the trial judge, are impressed with the testimony of these experts. The opinions which they expressed, however, were based on varying and unproved assumptions as to the speed at which the hoist was traveling when it struck the stop mechanism and the deceleration of stopping distance of that mechanism. We thus are reluctant to base our decision on the differing opinions of these experts. We attach significance to the fact that the stop mechanism which failed in this instance had functioned satisfactorily for about one year after it was first installed, that the other stop block on the same crossover device did not shear off, that the crossover device on the other crane beam installed for Fox never failed, and that apparently no other similar cross-over device manufactured by American had failed although they had been tested by the manufacturer and in practical use.
The evidence convinces us that the hoist was not moving under its own power when it struck the stop mechanism, but that instead it was pulled toward the end of the crane beam by the movement of the *371 rotary table. We think the hoist struck the stop mechanism while traveling about its normal speed, but that the load being lifted probably caused it to strike with more force than usual. We believe, however, that in the normal operation of overhead cranes, involving the lifting of heavy objects, the movement of the load itself sometimes causes the crane to move or travel on the crane beam, even though such a movement was not purposely activated by the crane operator. A movement of that kind, in our view, is one which should have been contemplated by the manufacturer, and we think Fox had the right to assume that the stop mechanism would prevent the hoist from running off the end of the crane beam even when that occurred. Several witnesses testified that the hoist occasionally strikes the stop mechanism while traveling at its maximum speed, 80 feet per minute, although the operator tries to stop the movement of the hoist before it reaches that point.
The evidence establishes that the weld of the "stop block" which was sheared off to the crossover device was defective. One expert pointed out that the stop blocks on the replacement crossover device had been properly welded "all the way around . . . on all four sides," whereas the stop block which sheared off in the accident had been welded on only one side, across one end and on one-half the other side. The stop block was about five inches long and only the upper half of it was welded to the crossover device. It is apparent that a considerable amount of strain was placed on the weld when the stop lever struck the lower part of the stop block, and it thus was important that the stop block be welded securely. We believe that the stop block would not have sheared off, and that the accident would not have occurred, if the stop block had been properly welded to the crossover device. The defective weld thus was a proximate cause of the accident.
The manufacturer or seller of a product which involves a risk of injury to the user is liable to any person, whether the purchaser or a third person, who without fault on his part sustains an injury caused by a defect in the design or manufacture of the article, if the injury might have been reasonably anticipated. Gauthier v. Sperry Rand, Inc., 252 So.2d 129 (La.App. 3 Cir. 1971); Meche v. Farmers Drier & Storage Co., 193 So.2d 807 (La. App. 3 Cir. 1967); Arnold v. United States Rubber Co., 203 So.2d 764 (La.App. 3 Cir. 1967).
An overhead crane system involves a risk of injury to the user. It is essential that such a crane be equipped with stops at the ends of the crane beams, which stops must be adequate to prevent the hoists from running off the ends of the beams. Injury to the user might reasonably be anticipated if one of these stops is inadequate because of a defective weld.
We agree with defendant that the law does not require that the manufacturer make the product "fool proof" or "accident proof." It does require, however, that it exercise reasonable care in the design and fabrication of its products which are of such a nature that, if not carefully made, can cause foreseeable injury to persons using the products for purposes which the manufacturer may reasonably expect them to be used. Failure of the manufacturer to exercise such care renders it liable if injury results from the lawful use of the product in a manner and for a purpose for which the manufacturer may be deemed to reasonably expect. Leathem v. Moore, 265 So.2d 270 (La.App. 1 Cir. 1972); Gauthier v. Sperry Rand, Inc., supra.
The crane in the instant suit was being used in a manner and for a purpose which the manufacturer obviously intended for it to be used. It was being used to lift and move heavy objects in a machine shop. The manufacturer was under a duty to exercise reasonable care to see that the stop mechanism on each crossover device was fabricated properly, so that it would provide the safety and protection which it was *372 intended to provide and which the user had a right to expect. We think the failure of the manufacturer to see that the stop block was properly welded constituted a failure to exercise reasonable care.
Defendant argues that Thibodeaux, plaintiff's employee, was negligent in operating the crane at the time the accident occurred, and that his negligence was the sole proximate cause of the accident. It takes the position that the crane was not being subjected to normal use at that time, and that the manufacturer thus is relieved from liability since the product was not being used for the purposes or in the manner intended.
Thibodeaux conceded that this was the first time he had picked up a rotary table, and that no one had instructed him as to how to pick it up. Defendant also points out that an expert called by plaintiff indicated that Thibodeaux had been negligent in that particular operation of the crane. Other witnesses testified, however, that Thibodeaux was a qualified, capable and an experienced crane operator who had worked for Fox for a long time, and they observed no negligence on his part in operating the crane on that occasion. Their testimony is to the effect that although the hoist does not normally strike the stop mechanism, either by oversight of the operator or by accident, it is a common thing for that to happen.
The trial court held that "it was not the negligence of the employee of plaintiff that caused the failure of the device." We think the evidence supports that conclusion.
We agree with the trial judge that there was a defect in the manufacture or fabrication of the stopping mechanism in the crossover device which failed, and that that defect constituted a proximate cause of the accident. We find no error, therefore, in the trial judge's conclusion that defendant is liable to plaintiff for the damages which he sustained because of the defects in the manufacture of that part.
In view of the conclusion which we have just reached, it is unnecessary for us to consider the additional argument of plaintiff that defendant also is liable to him because of a defect in the design of the crossover device.

Defects in Door Panels
The contract for the sale of the building provided that American was to sell and deliver to the purchaser an "American building of our standard design," with the roofing and siding to be of 26 gauge galvanized metal, and to include "five (5) 18'x 24' Double Sliding Doors." The contract also contained the provision "12 # LL 20 # WL," which means that the building was to be capable of withstanding a twelve pound "Live Load" and a twenty pound "Wind Load." The stipulation that the building be capable of withstanding a "Live Load" of 12 pounds per square foot refers to the weight or load on the roof, usually the weight of an accumulation of snow. The requirement that the building be able to withstand a "Wind Load" of 20 pounds per square foot means that it must be capable of withstanding a horizontal wind pressure of 20 pounds per square foot. Translated into wind velocity, it means that the building must be able to withstand an 88 mile per hour wind.
The official weather reports show that the highest wind which was recorded for the New Iberia area on September 16, 1971, had a velocity of 46 miles per hour, with gusts extending up to 69 miles per hour. The building thus was not subjected to a wind with a velocity of as much as 88 miles per hour at any time on that date.
The walls of the building were constructed so that they would withstand a wind load of 20 pounds per square foot, or a wind velocity of 88 miles per hour, as provided in the contract. The evidence shows, however, that the door panels were constructed to withstand a wind load of only 15 pounds per square foot, or a wind *373 velocity of only about 67 miles per hour. We have already noted that five door panels were destroyed by the windstorm which occurred on September 16, 1971, containing gusts which did not exceed 69 miles per hour.
Defendant concedes that the door panels were designed to withstand a wind load of only 15 pounds per square foot. It contends, however, that the contract requires only that the walls of the building withstand a 20 pound wind load, and that it does not require that the door panels withstand such a load. It takes the position that door panels are standard accessories to buildings of this kind, that under the contract it was required to provide door panels of standard design, and that the standard design of such panels require them to withstand only a 15 pound per square foot wind load. Defendant asserts that it never represented to plaintiff that the door panels would withstand more than that amount of wind load.
The trial court found that the provision in the contract requiring that the building be capable of withstanding a 20 pound wind load also applied to the door panels. We agree with that conclusion. The door panels in this case constitute a substantial part of the wall area of the building, and we find nothing in the contract which excludes that part of the wall area from the stipulation that it must be capable of withstanding a 20 pound wind load. In our opinion, the contract not only requires that the door panels be capable of withstanding such a wind load, but that the provision to that effect in the contract constitutes a representation by defendant that the building would have that quality. The record does not show that defendant ever informed plaintiff that the door panels would have a wind load strength which was less than that of the walls.
American asserts that it complied with the "standards, practices and usages of the metallic building industry" in designing Fox's building, that Fox was aware of those standards, and that Fox thus understood that the door panels were less wind resistant than were the walls. Defendant introduced in evidence the "Recommended Design Practices Mannual," published by the Metal Building Manufacturers Association, which it claims supports its contention that the building met the standards required by the industry. It points out that Fox had had extensive experience as a fabricator and manufacturer of equipment, and that during his negotiations for the purchase of the building he was advised by his personal friend and business associate, Standridge, who also was thoroughly familiar with the qualities of metal buildings. It is American's position, therefore, that there actually was a meeting of the minds of the parties that the door panels were to be of the type and strength required by the industry, and as set out in the above mentioned technical code or manual.
Fox testified that in his negotiations with defendant's representatives he insisted that he wanted a building which was "hurricane proof." While he may have mentioned that fact to defendant's agents, we hold that he ultimately contracted to purchase a building with a wind load of 20 pounds per square foot, instead of a hurricane proof building. The record does not convince us that plaintiff ever agreed or understood that the door panels were to be less wind resistant than the walls of the building, or that they were to satisfy the minimum requirements of the industry rather than the contract. It also does not show that the building was to be hurricane proof. We think the parties are bound by the contract provisions.
Defendant contends that the damage to the door panels was caused by "hurricane and tornado winds." A number of photographs taken on or immediately after September 16, 1971, were presented showing the widespread damage which resulted from the weather disturbance which occurred on that date. It asserts that the sporadic nature of hurricane and tornado winds are not reflected in the weather reports, *374 and that the other evidence presented shows that winds of hurricane force actually existed when this damage was done. The argument is that the damages sustained by plaintiff resulted from an Act of God, for which defendant is not liable, and that the winds which occurred at that time were in excess of those which the building was warranted to be capable of withstanding.
The evidence fails to show that the building was subjected to winds, or gusts of wind, in excess of 69 miles per hour. The fact that none of the walls of the building were damaged, and that the other five door panels withstood the storm, indicates that winds of hurricane force did not occur. If winds of that velocity had occurred, we think other damages to the building would have resulted.
Our conclusion is that the door panels of the building were defective in that they were not capable of withstanding the wind load provided in the contract. Defendant did not advise plaintiff of that defect in the design of the door panels, and it thus is liable to plaintiff for the damages Fox sustained as a result of that defect.

Quantum
The trial judge awarded plaintiff $2,225.95 as damages for the replacement of the destroyed hoist. Defendant has replaced the hoist, but in the companion suit judgment has been rendered condemning Fox to pay to American the above mentioned amount for that piece of equipment. We believe that American is obliged to replace the hoist, but since it has already done so, Fox is not entitled to keep the new hoist and also to recover the cost of it. American also is not entitled to recover from Fox the purchase price of the hoist which it was obligated to furnish as a replacement. Under the circumstances, we have decided that the judgment rendered in this case should be amended by reducing the award to Fox by the sum of $2,225.95. The judgment rendered in the companion suit also must be reversed, and American's demand for judgment against Fox for that same amount should be rejected.
The sum of $4,000.00 was awarded to plaintiff as the cost of constructing two crossover devices. The evidence does not show that the replacement crossover devices which were furnished by American are defective either in design or in fabrication, or that they will not provide the safety which is necessary in an overhead crane system of this kind. A simple inspection of the replacement device shows that the stop blocks on it have been shortened causing less strain on the welds, the welds are complete on all four sides, and a heavy steel plate has been added to prevent the device from being torn from the crane beam. All of the criticisms leveled at the crossover device which failed thus seem to have been corrected in the new one. We conclude that the trial court erred in awarding plaintiff $4,000.00 as the cost of constructing two new crossover devices.
The award of $300.00 for a trucking bill, $5,684.60 for the hiring of winch trucks, and $937.92 for the additional expenses incurred for employing a night watchman are supported by the evidence.
The trial judge allowed $1,678.90 as the cost of five new door panels. Fox was condemned to pay that amount to American in the companion suit. American was obliged to replace these door panels, and since it has done so, Fox is not entitled also to recover the cost of the panels from American. The judgment rendered in the instant suit will be amended by reducing the award by the sum of $1,678.90. The judgment rendered in the companion suit will be reversed, rejecting American's demands for that amount representing the purchase price of the door panels.
The judgment awards plaintiff $1,000.00 for "additional work on end panels." At the trial plaintiff offered evitence *375 tending to show that some vertical columns on the ends of the building were defective and would not support the structure in the event of a hurricane. Defendant timely objected to that evidence on the ground that there were no allegations to that effect in the pleadings. The trial judge referred the objection to the merits and permitted the evidence to be introduced subject to that objection. We find no allegations in the petition that there were defects in the vertical columns at the ends of the building, and since timely objection was made to evidence tending to show such defects, the evidence should have been excluded. The trial court thus erred in awarding plaintiff $1,000.00 for additional work on the end panels. The judgment appealed from must be reduced by that additional amount.
An award of $3,357.80 was made to plaintiff as the expense which he would have to incur in strengthening the door panels. Plaintiff and witnesses called by him estimated that it would cost $500.00 per panel, for each of the ten door panels on the building, to reinforce and strengthen panels so that they would be capable of withstanding a wind load of 20 pounds per square foot as provided in the contract. Defendant's experts testified that the panels could be strengthened for about $100.00 per door, or a total cost of $500.00, by providing for the placement of a metal bar across the center of those doors after they were closed. The trial judge rejected defendant's suggested method of adding strength to the doors, but he also held that plaintiff's estimate of the cost was excessive. Since an entire door panel cost only $335.78, the trial court held that the award for strengthening each door panel should be limited to $335.78 per panel, making a total of $3,357.80.
We agree that plaintiff is entitled to recover an amount sufficient to cover the cost of strengthening the door panels. In our opinion, however, the evidence does not support the award of $3,357.80 made by the trial court for that item of damage. Plaintiff alleges in his petition that he would incur an expense of only $2,000.00 for having that work done. He did not obtain bids for the job, he ordered replacement doors of the same type as those which had failed although stronger ones were available, and in our judgment the evidence does not substantiate his own estimate as to the cost of reinforcing the panels which he ordered. We believe that plaintiff is entitled to recover more than $500.00 for providing metal bars and brackets for the doors, as suggested by defendant, but that he is not entitled to recover the amount awarded by the trial judge or even the amount he demanded in his petition for that item of damage. We have concluded that an award of $1,000.00 for strengthening all of the door panels would be fair and adequate. The judgment appealed from thus must be amended by reducing the award for this item from $3,357.80 to the sum of $1,000.00.
Plaintiff alleges in Article 18 of his petition that he sustained additional damages in the amount of $10,000.00 for "inconvenience, trouble and additional work involved in operating half of his plant on such a make-shift, temporary basis, including the down-time and the consequent waste of the time of his employees." In Article 29 he lists as one item of the damages claimed, "Inconvenience, down-time and additional work, $10,000.00." The trial judge awarded him $15,000.00 as the "cost overrun on two winches." Defendant contends primarily that the award should be deleted because the alleged loss was not proved, and alternatively that it is excessive and should be reduced.
Fox testified that at the time the hoist was destroyed he was engaged in manufacturing 40 or 50 large winches. He stated:
". . . I had two of them I'd quoted on at sixty thousand dollars, and my estimated costI mean, what the cost figured when I finished was somewheres around thirty thousand dollars a piece more, and I'm not going to put all of that on to the fact that I didn't have the *376 crane, but our labor just went sky high because we were having to place this stuff, and it's precision machines on there, and particularly you have this stuffwe was having them to place it on there with a A-frame truck, and it's not very easy to move a big five ton capacity truck around in a shop in order to place them at a certain places inside of a frame where you're manufacturing a winch, and our cost just went completely out of reason on these jobs, and I figure that a tremendous amount of it was on these, due to the fact that we didn't have the hoist." (Emphasis added).
Fox stated that "the biggest part" of the overrun on the construction of the two above mentioned winches occurred during the time he was forced to operate his shop with only one overhead hoist.
In answer to interrogatories propounded to Fox prior to the trial, he stated that the loss of the crane system increased operating costs to the extent that extra time was required to complete jobs, because of the utilization of outside equipment. He stated that "on two contract jobs alone where the price was fixed by contract the labor overrun because of delays caused by the loss of the crane exceeded $10,000.00."
Mr. Herman A. Schellstede, production manager for Fox at the time this accident occurred, testified that two winches which were being built at the time of the accident had labor overruns of $10,000.00 for each winch. He stated that in his opinion the "biggest part" of the overruns on the manufacture of the two winches was due to the destruction of the hoist, although he conceded that the shop had had labor overruns on bids on other jobs over a period of years.
The above testimony is substantially all of the evidence which was presented to support plaintiff's claim of these additional expenses. No documents, books, records or accounts of any kind were produced showing the contract price for manufacturing these two winches. The evidence does not show a breakdown of the anticipated costs of those jobs. There is no showing as to when work on the winches began and when it ended, and thus how much of that time ran while the shop had only one hoist.
The plaintiff has the burden of proving each and every element of damages for which he seeks compensation. He must prove each such element by a preponderance of evidence, that is, the proof must be of such quality that the fact sought to be proved is more likely than not. Davis v. Transamerica Insurance Co., 289 So.2d 862 (La.App. 4 Cir. 1974); Foggin v. General Guaranty Insurance Co., 207 So.2d 176 (La.App. 2 Cir. 1967); Fox v. Argonaut Southwest Insurance Co., 288 So.2d 102 (La.App. 4 Cir. 1974).
In the instant suit plaintiff has failed to prove to the degree of certainty required by law the amount of the loss which he sustained as labor overruns in the manufacture of two winches, or that those overruns were caused by the destruction of one of the hoists in his shop and the delay which occurred in replacing that hoist.
We think the evidence establishes, however, that during the period of approximately three and one-half months, while plaintiff was compelled to operate his shop with only one crane, he was subjected to a considerable amount of inconvenience, trouble, down-time and additional work in having to move winch trucks in and about the building to do some of the lifting which would have been performed much easier and quicker by the overhead crane. Plaintiff is entitled to recover a reasonable sum as damages for that inconvenience, down-time and additional work, and we have concluded that an award of $5,000.00 for that item of damage would be fair and adequate. The award of $15,000.00 made by the trial court for "cost overrun on two winches" will be deleted, and instead an award of $5,000.00 will be made for inconvenience, down-time and additional work, as alleged in plaintiff's petition.
*377 Finally, plaintiff was awarded the sum of $5,798.00 as attorney's fees. Defendant argues that the trial court erred in making such an award, because attorney's fees are not specifically authorized by any of the contracts involved here or by statute.
Article 2545 of the Louisiana Civil Code, as amended by Act 84 of 1968, provides that the seller, who knows the vice of the thing he sells and omits to declare it, is answerable to the buyer for the restitution of price and repayment of expenses, "including reasonable attorney's fees." LSA-C.C. art. 2547, as amended by the same act, provides:
"A declaration made by the seller, that the thing sold possesses some quality which he knows it does not possess, comes within the definition of fraud, and ought to be judged according to the rules laid down on the subject, under the title: Of Conventional Obligations.
"It may, according to the circumstances, give rise to the redhibition, or to a reduction of price, and to damages, including reasonable attorneys' fees, in favor of the buyer." (Emphasis added).
Defendant, as the manufacturer as well as the seller of the crane system and of the building purchased by Fox, is presumed to have knowledge of defects in the object it produces. Breaux v. Winnebago Industries, Inc., 282 So.2d 763 (La.App. 1 Cir. 1973). It failed to disclose them to plaintiff. We conclude that the plaintiff is entitled to recover attorney's fees, and that the award made by the trial court is fair.
For the reasons assigned, the judgment appealed from is amended by reducing the award made to plaintiff Fox, against defendant American, from $40,983.17 to the sum of $19,720.52. In all other respects the judgment appealed from is affirmed. One-half of the costs of the appeal in this case are assessed to plaintiff-appellee, and the remaining one-half of such costs are assessed to defendant-appellant.
Amended and affirmed.