323 So.2d 496 (1975)
Wilson L. GORDON, Plaintiff-Appellee-Appellant,
v.
GENERAL MOTORS CORPORATION, and Royal Indemnity Company, Defendants-Appellants-Appellees.
No. 5241.
Court of Appeal of Louisiana, Third Circuit.
November 20, 1975.
Rehearing Denied December 17, 1975.
*497 Plauche, Smith & Hebert, by A. Lane Plauche, Lake Charles, and H. Ward Fontenot, Cameron, for defendant-appellant.
Jones & Jones, by Jerry G. Jones, Cameron, for plaintiff-appellee.
Brame, Bergstedt & Brame, by Joe A. Brame, Lake Charles, for intervenor-appellee.
Before MILLER, WATSON and CUTRER, JJ.
CUTRER, Judge.
Plaintiff, Wilson L. Gordon, brought suit against defendants, General Motors Corporation and its insurer, Royal Indemnity Company, for damages allegedly sustained by him in a vehicular collision, the cause of which was alleged to have been defective ball joints on plaintiff's GMC truck, which was manufactured by General Motors. An intervention was filed by State Automobile and Casualty Underwriters for workmen's compensation benefits and medical expenses paid in connection with the plaintiff's injuries as of the date of the intervention and for all additional sums which the intervenor might be required to pay following that date. After a jury trial, judgment was rendered in favor of plaintiff awarding him $867,000, which amount was reduced by remittitur to $467,000. The judgment also recognized the intervention for workmen's compensation benefits and medical expenses totaling $22,776.30, as of October 25, 1974, plus all additional sums which the intervenor might be required to pay in the way of compensation benefits or medical expenses following the trial.
Defendants appealed from that judgment contending that the jury committed manifest error in finding that a defect existed which caused the accident, and further contending that the award, even after being reduced by remittitur, was so high as to constitute an abuse of discretion. Plaintiff appealed, by separate appeal and by answering defendants' appeal, contending that the trial judge erred in reducing the award and in denying plaintiff attorney's fees. We affirm.
The pertinent facts are as follows: On February 8, 1971, Saltzman & Gordon Welding Service, Inc., purchased a new 1971 GMC truck from Martin GMC Trucks, Inc., an authorized General Motors dealer in Lake Charles, Louisiana. A standard welding body was installed on the truck by the purchasers. The truck was *498 used primarily by the plaintiff, who was a welder with and part owner of Saltzman & Gordon Welding Service, Inc.
On May 22, 1971, about 6:00 A.M., plaintiff was traveling alone in the truck going from Kaplan to Johnson Bayou. He had traveled west on Interstate Highway 10 to Sulphur and then had turned south on Louisiana Highway 27, a two-lane blacktop highway. When he was a few miles south of Hackberry, he approached a car towing a boat trailer proceeding in the same direction. The car was being driven by Nolan Burleson and had as a passenger the Reversed Everett Schiltz. Gordon passed the Burleson vehicle and pulled back into the right lane. After he had returned to the right lane Gordon's truck "jerked" to the right and off the road. When Gordon tried to recover the truck pulled hard to the left, pulling Gordon into the path of an oncoming truck, a large tractor-trailer unit being driven north by H. B. Stansberry. The left front wheel of Gordon's truck collided with the dual wheels to the rear of the tractor portion of the oncoming vehicle.
Plaintiff brought suit alleging, among other things, that a defect in the lower left ball joint assembly, which permitted the truck to dart or drift, caused the accident. Defendants admitted that the ball stud in the ball joint assembly was bent, but defendant on the basis that this condition resulted from the accident and did not exist prior to the accident. A jury trial was had, and a verdict was rendered in favor of plaintiff awarding him damages in the amount of $867,000. The trial judge granted a remittitur of $400,000 and denied plaintiff's claim for attorney's fees. An appeal was taken by defendants. Plaintiff appealed the action of the court in granting the remittitur and denying attorney's fees, and answered defendants' appeal on the same basis.
Defendants argue on appeal that plaintiff has failed in his burden of proving that the ball joint assembly was defective at the time of assembly. Even assuming the defect, defendants argue that plaintiff failed to prove that the defect caused the accident. Defendant cite the following language from Weber v. Fidelity & Casualty Company of New York, 259 La. 599, 250 So.2d 754 (1971) as controlling the plaintiff's burden of proof in this case:
"A manufacturer of a product which involves a risk of injury to the user is liable to any person, whether the purchaser or a third person, who without fault on his part, sustains an injury caused by a defect in the design, composition, or manufacture of the article, if the injury might reasonably have been anticipated. However, the plaintiff claiming injury has the burden of proving that the product was defective, i.e., unreasonably dangerous to normal use, and that the plaintiff's injuries were caused by reason of the defect.
* * * * * *
"If the product is proven defective by reason of its hazard to normal use, the plaintiff need not prove any particular negligence by the maker in its manufacture or processing; for the manufacturer is presumed to know of the vices in the things he makes, whether or not he has actual knowledge of them." 250 So. 2d at 755.
In applying this test to the present factual situation defendants argue that there is no reasonable factual basis for the jury's finding that the vehicle involved was defective in design, composition or manufacture, or that the defect, if present, caused plaintiff's injuries. Defendants contend that plaintiff adduced highly questionable evidence that the loose ball joint condition existed prior to the accident.
Under the language cited from Weber, in order for the jury in this case to have rendered a verdict in favor of plaintiff they must have found as a matter of fact that there was a defect in the design, composition or manufacture of the ball joint *499 assembly which was unreasonably dangerous to normal use, and that plaintiff's injuries were caused by reason of the defect.
Before discussing the evidence presented in this case, it is important to note first the controlling rule on the scope of appellate review of factual issues by the appellate courts of this state:
"When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts." Canter v. Koehring Co., 283 So.2d 716, at 724 (La. 1973).
With this principle in mind, we will proceed with a review of the evidence presented to the jury in this case.
Ernest Everage, one of plaintiff's expert witnesses, first examined the lower left ball joint assembly in April, 1974. At that time the cotter pins had not been removed from the ball joint studs and the entire spindle was apparently in the same condition as had existed prior to its removal from the truck. Without removing the stud from the hole, Everage could determine that the hole was "out of round". It was his opinion that the looseness of the stud in the hole existed prior to the accident. He based this conclusion on the absence of damage to the threads of the ball joint stud, the presence of grime and a greasy buildup in the spindle and evidence that it had been moving in this buildup, and the fact that the out of round condition was 90 degrees away from the forces of impact, from side to side rather than from front to back. The ball joint assembly was again examined by Everage in October, 1974. This examination confirmed what he had concluded in April. A comparison was made with the hole in the right ball joint assembly and it showed that the left hole was egg shaped and larger. Everage again concluded that the looseness pre-dated the accident. He testified that the looseness in the ball joint stud would cause the wheel to move in and out at the bottom. This in turn would cause the truck to dart or sway back and forth across the highway. He testified that this looseness could cause the truck to pull two, three, four or five feet, and that this movement could occur without any movement in the steering wheel.
Edward Harris, a Professor of Mechanical Engineering at Tulane University, another of plaintiff's expert witnesses, also gave testimony which concluded that there was a defect in the ball joint assembly and that the defect could cause the vehicle to dart or sway. His examination of the ball joint assembly indicated that the hole in the lower ball joint was egg shaped, instead of circular, with the long dimension running traverse to the truck. It was his opinion that the elongation of the hole was not caused by the accident, but pre-dated it.
Dr. Oscar W. Albritton, a Professor of Engineering at Louisiana State University, was qualified before the court as an expert in the fields of metallurgy and mechanical engineering. A complete disassembly of the ball joint assembly was performed under court order in September, 1974, by the defendants' metallurgist, Robert Anderson, in Houston. Dr. Albritton participated in *500 the disassembly process and made a detailed metallurgical examination of each component of the assembly. The first discovery made was that the ball stud in the lower left ball joint was bent, which observation could be made with the naked eye once the stud was removed from its housing. Secondly, it was noted that the tapered hole in which the stud fit was "wallowed out". The parts were then taken to Dr. Albritton's laboratory at L.S.U. for comparison with a new assembly furnished to him for purposes of the study. Measurements were made to make a comparison of the shape and size of the wallowed hole to determine exactly where it was out of round and how much. The results showed mathematically what Dr. Albritton had seen in his examination in Houston. The conclusion reached by Dr. Albritton was that the ball joint stud had been bent when installed in the assembly. His opinion was based on the following: There were no damage marks to any part of the stud nor to the housing cover. By orienting the bent stud to the out of roundness of the hole, it was noted that the hole was not in line with the direction of the forces of the accident. This tended to show that the forces of the accident had not caused the bend. Further, the bend in the stud was within the housing, not to a portion of the stud outside the housing. Under microscopic examination, the metallurgical examination of the bent stud and hole revealed a wear pattern on the stud which was somewhat eccentric with respect to the hole. With a bent stud in the tapered hole, the hole was eventually wallowed out because of the uneven distribution of the load being placed on the ball joint by the operation of the vehicle.
The jury verdict was also supported by some of the testimony of the defendants' experts. Sam Evans, a mechanic with Martin GMC Trucks, Inc., testified, when questioned about the effect of loose ball joints, that the vehicle would have a tendency to wander back and forth on the road.
The testimony elicited from Robert Anderson, defendants' metallurgical expert, indicated that he had taken no measurements to indicate where the out of round condition existed. He was unable to correlate the out of roundness to the bend in the stud because he never made the measurements necessary for this determination. He was only able to testify as to his visual observations. During direct examination Anderson reassembled the lower ball joint in the socket to demonstrate that there was no looseness. On cross-examination Anderson was called upon to again reassemble the ball joint, this time to conform to his own measurements of the location of the various parts of the assembly taken prior to the original disassembly. This reassembly revealed looseness in the ball joint assembly, thereby throwing some doubt on his credibility.
Jack Kruesberger, another expert called by defendants, testified about an experiment he performed before trial for General Motors involving riding over Southwest Louisiana in a 1971 GMC truck that had the nut loosened on the ball joint stud. His direct testimony indicated no difficulty in controlling the vehicle. Cross-examination of this witness, however, revealed that his experiment was irrelevant because he was using an unbent ball stud and a perfectly round hole.
We conclude from the foregoing testimony that there was sufficient evidence in the record to support a conclusion that the lower left ball joint assembly was defective and unreasonably dangerous to normal use in its defective condition. Defendants contend, however, that even if the assembly was defective such defect could not cause the accident.
The record does not support this contention. In addition to the foregoing evidence indicating that the lower left ball joint assembly was defective prior to the accident and that the condition could cause the vehicle to dart, sway or wander back and forth on the road, the jury had before *501 it the following evidence of the events leading up to the accident: Nolan Burleson testified that he was driving his car towing a boat trailer and was passed by the plaintiff's vehicle while proceeding south on Louisiana Highway 27. The passing maneuver took place shortly before the accident. He stated that his attention was directed to the plaintiff's vehicle because he noticed smoke coming from the left front wheel. He estimated his speed at 45 miles per hour because he could not pull the boat trailer any faster than that. He estimated the plaintiff's speed at 50 to 55 miles per hour. After passing the Burleson vehicle, plaintiff moved back into the right lane of the two-lane highway. Plaintiff's vehicle had not gone far when Burleson saw it "dip" and veer to the right, with the right tires going off the road. When the car pulled back to the left it collided with the oncoming truck.
This eyewitness' testimony was in accord with the plaintiff's testimony. Plaintiff stated that he passed the Burleson vehicle just prior to the accident. He passed the vehicle and returned to the right lane. Just after returning to that lane, he said, the truck "jerked to the right and jerked me off the road." He managed to regain control of the vehicle but the same thing happened again. He turned the wheel to right the vehicle again and attempted to brake it. The collision with the truck followed.
The evidence before the jury indicated that the lower left ball joint assembly was defective at the time of assembly. It further indicated that this defective condition could cause the vehicle to sway, dart or wander across the highway. The testimony of the plaintiff and an eyewitness indicated that this darting or wandering took place just prior to the accident. We conclude from this testimony that the defective condition of the ball joint assembly set in motion the chain of events which resulted in the accident and plaintiff's injuries.
Our review of the record in this case indicates that the jury's verdict had a reasonable factual basis. Finding no manifest error in the conclusions reached by the jury as to the existence of a defect in the lower left ball joint assembly and its causal relationship with the accident, we will not disturb their verdict on the issue of liability.
The next argument made by defendants is that the trial judge erred when, in his charge to the jury, he refused to charge them as to the presumption of negligence of a motorist who collides with another vehicle in the other vehicle's lane of travel. We cannot agree that error was committed. We have reviewed the cases cited by the defendants which apply the presumption, as well as other cases not cited, and found that all involve suits to determine liability as between the drivers of the colliding vehicles. See, for example, Noland v. Liberty Mutual Insurance Company, 232 La. 569, 94 So.2d 671 (1957); Rizley v. Cutrer, 232 La. 655, 95 So.2d 139 (1957); Schick v. Jenevein, 145 La. 333, 82 So. 360 (1919); Johnson v. McKay, 306 So.2d 417 (La.App. 3rd Cir. 1975). The present action involves not the question of liability as between the colliding motorists but rather the question of liability of the manufacturer of one of those vehicles to the driver of that vehicle based on the manufacture of a defective product. We do not think that the presumption applies in the present case. If it were applied, a far greater burden of proof would be placed on the plaintiff whose vehicle, as in this case, veered to the left and into the oncoming lane of travel than on the plaintiff whose vehicle veered to the right and off the highway. The trial judge was correct in refusing to charge the jury as requested by defendants.
The next issue with which we must deal involves the damage award. The jury returned a verdict awarding plaintiff $867,000. A remittitur of $400,000 was *502 agreed upon and the judgment reformed accordingly. Defendants argue on appeal that, even after the remittitur was entered, the award constitutes an abuse of the "much discretion" vested in the trier of facts and should be further reduced. Defendants further argue that under Miller v. Chicago Insurance Company et al, 320 So. 2d 134 (La.1975), we are permitted to review only the award as it stands following the entering of the remittitur. One of the issues presented in that case was whether, on appeal, an appellate court could review the jury award prior to the entering of an additur or remittitur to determine whether that original award was within the "much discretion" bounds imposed by LSA-C.C. article 1934. The Supreme Court held that only the final judgment of the court could be reviewed, not the judgment prior to the entering of the additur or remittitur. Otherwise, the trial judge's power to grant a new trial in the absence of an acceptance of the additur or remittitur by the parties would be ignored.
Plaintiff argues that the Supreme Court's holding in Miller is not applicable here because of the alleged error committed by the trial judge in the manner in which he set out to determine the remittitur. The basis for plaintiff's contention of error is that the judge made his determination by using calculations on a scrap of paper found in the jury room which indicated to him that the award for loss of future earnings granted by the jury was arrived at by multiplying $17,000 by 34, the former figure representing plaintiff's yearly income and the latter figure representing plaintiff's life expectancy. The trial judge's reasons for granting a new trial in the absence of the plaintiff accepting a remittitur do indicate that he found the scrap of paper mentioned by counsel for plaintiff. However, his reasons, which were transcribed into the record, indicate that the decision of the trial judge was based on a review of all the evidence presented at the trial and his determination that the award made by the jury was excessive in light of all the evidence. Any error on the part of the trial judge in noting the scrap of paper found in the jury room was harmless under the circumstances.
We will now review the evidence relative to quantum to determine if there was a clear abuse of the wide discretion vested in the trier of facts under LSA-C. C. article 1934. Fox v. State Farm Mutual Automobile Insurance Co., 288 So.2d 42 (La.1973).
Plaintiff was injured early on the morning of May 22, 1971. Following the accident he was taken to the hospital in Sulphur, where he remained for 54 days. He was treated by Dr. Jerome Ambrister and Dr. John E. Wood while in the hospital. His primary injuries consisted of a laceration over the right eye, comminuted fracture of the wrist with the bone protruding from the left forearm, comminuted fracture of the upper tibia and fibula with the bone protruding from the proximal portion of the left leg, a massive fracture of the left hip involving the acetabulum and gross fractures involving six teeth.
Dr. Wood, a practicing dentist in Lake Charles, was called after the accident by Mrs. Gordon to see the plaintiff on an emergency basis. Dr. Wood examined the plaintiff and found a number of fractured teeth. In his deposition, Dr. Wood stated that "when I say fractured teeth I mean these teeth were grossly fractured and this was the type of thing that was causing him excruciating pain, I'm certain." On examining the plaintiff, Dr. Wood stated that he found fractures of the mandibular right second bicuspid and second molar, which involved the entire cuspids of these teeth. The fractures were such that not only the enamel portion of the cusps was fractured but the fracture extended into the dentin, which was causing the excruciating pain. He also had fractures of the lower left first and second molars which resulted in a loss of the entire buckle cusps of both teeth. Also fractured were the maxillary left first and second molars. Dr. Wood *503 had taken some temporary crowns with him when called by Mrs. Gordon, and he attempted to cover the exposed areas of the teeth with these crowns. He saw the plaintiff several days later when Mrs. Gordon called to tell him the plaintiff was still experiencing pain and that one of the crowns had come loose. He adjusted the crowns during this second visit in an effort to again cover the exposed portions of the injured teeth. He next saw the plaintiff at his office on November 9, 1971. At that time he examined the plaintiff's mouth with X-ray equipment to determine the full extent of injuries to the plaintiff's mouth. He later extracted two teeth, repaired four others, and installed bridge work.
Dr. Ambrister, a practicing orthopedic surgeon in Lake Charles, first saw the plaintiff in the emergency room of the West Calcasieu-Cameron Hospital following the accident. His initial examination of the plaintiff indicated a laceration over the right eye. There was also a bone protruding from the left forearm near the wrist. The plaintiff was complaining of pain in the area of the left hip, and attempts to move that area produced extreme pain. There was also a bone protruding from the proximal portion of the left leg. Dr. Ambrister described the injuries received by the plaintiff as painful. He treated the plaintiff on a regular basis from the date of the accident until July 12, 1973. When Dr. Ambrister last saw the plaintiff, his left lower extremity was functionless. The hip joint was immobile, the knee had limited motion and he had an equinus deformity of the left foot. Because of the injuries to his left lower extremity, the plaintiff was unable to ambulate without the assistance of crutches.
On July 27, 1973, plaintiff consulted Dr. Jesse H. Dickson, an orthopedic surgeon in Houston, who confirmed Dr. Ambrister's diagnosis and also found an injury to one of the nerves in the plaintiff's left ankle, which prevented him from walking on his heel. His examination indicated that the plaintiff had a perineal palsy, a complete foot drop. In other words, he was unable to make his left foot move to an angle such as that made when walking. In considering the alternatives with reference to treatment of the hip injury, Dr. Dickson ruled out hip fusion because of the added stress this would place on the knee and ankle. A cup orthoplasty, which involves the making of an artificial joint by sliding a very fine piece of metal between the two bones of the joint, was ruled out for the same reason. Total hip replacement was the remaining available procedure. But even this procedure involved problems because this operation usually is not performed on persons under the age of 60, and because there was potential for the inserted ball and socket to fail, thus requiring the plaintiff to go back to his crutches. Dr. Dickson performed surgery on the plaintiff on August 10, 1973. This involved the lengthening of the heel cord and ligaments behind the ankle. On November 9, a four hour surgical procedure was undertaken to replace the injured hip. Dr. Dickson described this surgery as "exceedingly difficult" because of the severity of the hip injury and because as part of the healing process an extra amount of bone had formed in the area due to ectopic calcification. Plaintiff remained in the hospital for seventeen days following this surgery. Problems developed later. In early January, X-ray examination revealed that the ball had come out of the socket. Plaintiff was again hospitalized with a pin being placed in the lower part of his thigh bone, with 35-40 pounds of traction on this pin for a period of ten days. The ball and socket responded very little and remained out of socket. Other surgical options were considered but discounted because of the likelihood of failure due to an increase in ectopic calcification. As of the date of trial plaintiff was still in the same condition, and Dr. Dickson was of the opinion that the condition had "diminished 80% of the normal function of that extremity." In addition to the present problem, Dr. Dickson indicated that other problems could develop in the future. Medical studies indicate *504 that in two or three years patients with similar problems develop a low grade infection resulting in pain and stiffening of the hip.
Dr. Dickson's prognosis in connection with the plaintiff's future employment prospects as a welder was not encouraging. When the plaintiff first went to Dr. Dickson he informed the doctor that he had attempted to go back to work as a welder, not standing up welding, but sitting down. He had found, however, that his hip pained him too much to sit for the long periods of time required for the work. After the hip replacement operation in November of 1973, the pain subsided, but the plaintiff was informed that he would not be able to do offshore welding again because of the strenuous nature of the work. After the ball came back out of the socket the plaintiff's hip reverted to its preoperation condition. Dr. Dickson concluded that the plaintiff's left leg would continue to tire easily, and he would need the assistance of crutches or a cane to move about. Any work he performed would have to be geared toward sitting and not walking and standing.
In addition to the above evidence relating to the pain and suffering of the plaintiff in connection with this accident, the other evidence of losses incurred by him in connection with the accident is as follows: A stipulation was entered in the record that the employer's compensation insurer, State Automobile and Casualty Underwriters, had paid $14,143.30 in medical expenses as of the date of trial. In addition, plaintiff paid $1,494.00 in travel expenses in connection with his medical treatment. Based on these figures, plaintiff argued that a minimal estimate of future medical expenses should be $10,000. The record further indicated that the average annual salary of the plaintiff during the four years preceding the accident was $13,153.-36. Taking all of these figures, and noting with reference to the determination of loss of future earnings the Supreme Court's decision in McFarland v. Illinois Central Railroad Co., 241 La. 15, 127 So.2d 183 (1961), which rejected the application of a mathematical formula for determining loss of future earnings, we feel that the award of $467,000 in this case was clearly within the wide discretion vested in the trier of fact under LSA-C.C. article 1934. Finding no abuse of discretion with respect to the amount awarded to plaintiff, we affirm the judgment.
Plaintiff has appealed, arguing that the trial judge erred in refusing to award him attorney's fees. The basis for plaintiff's claim is LSA-C.C. article 2545, which provides as follows:
"The seller, who knows the vice of the thing he sells and omits to declare it, besides the restitution of price and repayment of the expenses, including reasonable attorneys' fees, is answerable to the buyer in damages."
Plaintiff argues that in recent years the courts of this state have interpreted this article to apply not only as between the buyer and his immediate seller, i.e., the retailer, but also as between the buyer and the manufacturer of the product, thus eliminating as a prerequisite to recovery privity between the buyer and seller. Plaintiff cites numerous cases to support his contention that attorney's fees are due in this case, including Media Production Consultants, Inc. v. Mercedes-Benz of North America, Inc., 262 La. 80, 262 So.2d 377 (1972), Rey v. Cucia, 298 So.2d 840 (La. 1974), Smith v. Max Thieme Chevrolet Co., Inc. et al, 315 So.2d 82 (La.App. 2nd Cir. 1975), Dunlap v. Chrysler Motor Corp. et al, 299 So.2d 495 (La.App. 4th Cir. 1974), Fox v. American Steel Building Co., Inc., 299 So.2d 364 (La.App. 3rd Cir. 1974), Baughman v. Quality Mobile Homes, Inc., 289 So.2d 376 (La.App. 1st Cir. 1973), Breaux v. Winnebago Industries, Inc., 282 So.2d 763 (La.App. 1st Cir. 1973) and Ford v. Broussard, 248 So.2d 629 (La.App. 3rd Cir. 1971).
Our review of these cases indicates that each was an action in redhibition, not a *505 products liability case. Plaintiff herein seeks only damages incurred as a result of injuries caused by operation of a defective product manufactured by General Motors. He does not seek rescission of the sale nor reduction in price. Therefore, we are of the opinion that LSA-C.C. article 2545 is inapplicable to this case, and that the trial judge properly denied attorney's fees.
For the reasons assigned the judgment of the trial court is affirmed at defendants-appellants' costs.
Affirmed.