JOHNSON, Judge.
The plaintiff, Harold Ryan (hereinafter called Ryan), an individual, brought this tort action for damages for accidental personal injuries against the defendants, B & G Crane Service, Inc., (hereinafter called Crane Service), and Aetna Casualty and Surety Company, the Crane Service’s public liability insurer. After trial on the merits the Civil District Court for the Parish of Orleans rendered judgment on July 14, 1967, in favor of the defendants, dismissing plaintiff’s suit and plaintiff has appealed.
The plaintiff was employed by Maritime Electric Company (hereinafter called Maritime), in a hazardous occupation. The accident happened on February 18, 1963, while plaintiff was performing his duties. This suit was filed on February 17, 1964, against defendant Crane Service as a third party tort-feasor. The Fidelity and Casualty Company of New York, for Maritime, paid workmen’s compensation to plaintiff and paid medical benefits on behalf of plaintiff. On April 16, 1964, the Fidelity and Casualty Company of New York intervened in this suit to recover the amounts paid. The judgment of the trial court of July 14, 1967, also dismissed this intervention.
To epitomize the allegations of plaintiff’s petition, it is alleged that Maritime was constructing a high voltage steel tower near Michoud in Orleans Parish; that the tower was to be built in excess of 200 feet in height and Maritime rented from Crane Service a crane of the crawler type with all necessary parts including a boom of sufficient length to reach the top of the tower; that the boom was made up of steel pipe or tubing in sections 30 feet long and about 5 feet square; that Crane Service employees delivered these boom sections to the site by truck and were unloaded by Maritime employees; that the boom sections are fastened end to end to extend the boom to the desired length; that with each section the Crane Service delivered two steel wire cables of about an inch and a half in diameter, conforming in length to each section, which are called pendant lines weighing about 125 pounds each; that they were placed lengthwise on top of each boom section on the truck when the boom sections were delivered to Maritime; that to unload the boom sections a smaller crane was used to lift the boom sections with the pendant lines from the truck; that plaintiff with two other Maritime employees went upon the truck to hook the lifting or spreader lines to the boom section and when the crane operator partially lifted the boom section from the bed of the truck the pendant lines lying on top of the section shifted position which caused the boom section to become off balance; that the spreader lines came unhooked from the section at one end causing the section to swing or turn and strike plaintiff, knocking him violently to the ground and injuring him seriously. The plaintiff alleges that Crane Service was negligent in failing to fasten the pendant lines to the boom section to prevent the lines from moving when the boom section is lifted off the truck; that the improperly secured lines without a safety catch attaching them to the section on the truck constituted a trap; that plaintiff should have been' warned of this condition, all of which was negligence on -the part of Crane Service and its employees.
The answer of defendant denies generally that there was any negligence on the part of Crane Service or its employees and defendants allege that the cause of the accident was the negligence of plaintiff *516 and others who were not under the control and direction of defendants. The answer admitted that Maritime had rented a large crane from Crane Service including the boom sections and that Crane Service was delivering the sections to plaintiff’s employer, but that the unloading of the parts was to be and was being done entirely by employees of Maritime, including the plaintiff.
As we understand it, the boom of some 200 feet long to be used on the large crane is made up of steel piping or tubing with crossbars and braces. The sections are fastened together to make up the boom and running with the sections are two pendant lines of heavy wire cable which are fastened together end to end along the entire length of the boom. They served in lifting and lowering the boom and we presume, though it is not clearly described, that these pendant lines are fastened at the top and bottom of the boom to act as a safety chain to give strength to the boom. Then there is a lift cable that runs from the drum at the bottom through the boom, around the top end and down to handle the work load. At the end of that lift cable is a large metal ball, called headache ball, to give weight to bring the line down when there is no load on it.
Two pendant lines were delivered with each 30 foot boom section conforming in length to each boom section and they were lying on top of the boom section on the truck when the truck arrived on the Maritime site. The sections and lines were delivered by Crane Service truck and employees but were unloaded by employees of Maritime. After having unloaded one section from the truck that morning without incident, the plaintiff and two other men got on the bed of the truck to fasten the two spreader lines, one to each end of the section. A small crane was used to unload the boom sections. These spreader lines were each about 20 feet long and after one end was hooked by plaintiff at the end of the leg of the section and one end of the other spreader line was hooked by the other two men to the opposite leg of the section at the other end, the two spreader lines are hooked into the main lift line from the small crane boom. In this manner the two spreader lines form an inverted “V”.
Referring to plaintiff’s testimony in his own behalf, he said that he was 46 years old and had worked for many years as a lineman electrician in the construction of high voltage towers. On that day he and other Maritime employees were unloading from a truck the 30 foot boom sections to be used on the large crawler crane to extend the boom to the desired length. These men had already unloaded one section from that same truck without incident and they went about unloading the second section in the same manner. The sections were exactly alike. Plaintiff got on the rear of the truck. The other men were on the front end next to the cab of the truck. Plaintiff’s job was to wrap one end of the spreader line around the outside leg of the section at the rear of the truck. It tightened itself as the section was picked up. The other men at the front end of the truck did the same thing with the other spreader line, but attached the line to the opposite leg of the section so that the lines were hooked “crisscross * * * one opposite the other” on the section. Plaintiff said he saw the pendant lines lying on the section when he attached the spreader line. When one of the men gave the word that the spreader lines were hooked the crane operator lifted the section about a foot or two above the bed of the truck and stopped it to check the load balance. The load seemed to be in perfect balance and plaintiff said it was time then to get off the truck. We quote the following from his testimony:
“After I secured my end I stood there waiting for them to come up, and when I saw them come up so far with it I started to make a turn sort of to get down, figuring everything was okay to get off the truck, and when I did the *517 next thing you know it looked like everything came at me, the whole thing came flying at me, and with that I leaped to keep it from knocking me off backwards, and the next thing I knew I went flying in the air and I don’t remember anything more than that. The next thing I remember, I was laying on the other * * * ”
Ryan said that the system of unloading these sections was that after the small crane lifted the section slightly from the bed of the truck to test the load balance on the crane lift, it was then time for the truck driver to pull forward to take the truck from under the load when the crane operator would lower the section to the ground. (Other witnesses say the crane swings the section away from the truck.) He said he looked at the load and it appeared to be all right “ * * * and when I made the turn to look down it came flying at me. * * * I was knocked to the ground * * * and I remember coming to in the ambulance on the way to the hospital.”
Paul Robillia and Irwin M. Laborde, Maritime employees and witnesses for plaintiff, were the other two men on the truck with plaintiff to hook the spreader lines to the section preparatory to lifting it off the truck. They were on the truck next to the cab. Plaintiff was at the rear end. Robillia testified that he did not notice where plaintiff fastened his end of the spreader lines but he “gathered” it was on the opposite side of the boom section from him. After the men at both ends of the boom section fastened the spreader lines to the section Robillia gave the signal to the crane operator to lift the boom section off the body of the truck. The crane operator lifted the section about 18 inches to two feet from the truck bed. The section was held there a few seconds to check its balance. It seemed to be well balanced, Robillia again gave the signal to the crane operator to lift the section off the truck. During that operation he noticed the pendant lines lying on the section with the ends toward him tied to the boom section with bailing wire. Here is the way he described the accident:
“I gave the signal to pick up and she picked up a couple of feet, trying to clear the top end of the cab to swing around away from us, and it picked up a couple of feet, just enough to clear it, and the front sling on my side come loose, causing the back end to slip down— well, I jumped clear and landed on my foot looking toward the load to see if would come my way, so I could go one way or the other, and I saw it swing and hit Harry and driving him towards me and into, the shackle — hitting him on the hand and on the side of his head and his arms and chest.”
Mr. Robillia testified that after the accident he noticed that the bailing wire at his end of the boom section was “tore loose.” He said he did not recall but he thought the ends of the pendant lines at plaintiff’s end of the boom section “all came out.” He said that after checking the balance of the load he told the crane operator to swing out. The operator started to move the boom section out from the truck. Rob-illia saw the section tilt and the eye of the spreader line came unhooked from the boom section causing that end to fall and hit the cab of the truck and to slide off the truck bed to the ground.
Mr. Robillia admitted that it was his duty to attach the spreader line to the boom section in a safe manner and if he had seen anything that was dangerous he would not have given the signal to lift the section off the truck. He said he did not see any dangerous condition. He had unloaded other sections and the pendant lines on this occasion were in the same position as at other times and he was satisfied they were all right. After the boom section had fallen to the ground, he noticed that only one of the pendant lines was on the ground. He described the movement of the boom section as it was being lifted off the truck by the crane operator by saying it looked to him like *518 the boom rolled a little and “all of a sudden she let go. When she rolled she tilted and when she got the heavy weight on the back end it popped that sling off.” Mr. Robillia further testified that the spreader lines were already attached to the crane lift line when they came to him to be attached to the boom section and that nobody from Crane Service hooked them to the section. He said they had unloaded a boom section that same day just before the accident, using the same crane and the same manner of operation.
Mr. Laborde testified that he got on the truck with Robillia and Ryan; that he and Robillia were on the truck next to the cab and Ryan was at the rear of the truck, and that they hooked the sling to the boom section. He said that “was our job” and that Ryan was doing the same on the other side at the other end. Mr. Laborde called the spreader line “the sling.” He said the sling was already hooked onto the crane when the crane operator boomed the line over to them. He and Robillia hooked the sling to their end of the boom section on the truck and Ryan hooked on at the other end. The pendant lines were fastened to the boom section at Laborde’s end with two strands of bailing wire. He did not notice how the pendant lines were at the other end next to Ryan. He did not know who gave the signal but the crane operator lifted the boom section about 18 inches when they noted that the load was level. He and Robillia then started to get off the truck, at which time the crane operator lifted the boom section higher and started to swing it around, when the boom “went off balance and it fell.” He said the end closest to the cab went up in the air, then fell, and “ * * * it hit a headache ball [a large metal weight] on the truck and it bounced and then fell off.” Mr. Laborde did not see anything that caused his end of the boom section to go up. After the accident La-borde said he saw the boom section lying on the ground beside the truck and one end of it was up in the air with the pendant lines lying on the ground. At that time they were not tied to the section but were lying loose on the ground.
Right here we comment that Laborde does not say how long after the accident it was when he saw the pendant lines lying loose on the ground detached from the boom section or whether somebody had in the meantime taken them off the boom section. Robillia and Laborde are positive that the ends next to the cab were tied to the section with wire at the start of the lift. The ends of the pendant lines next to plaintiff were not tied to the boom section on the truck, but were draped into the frame of the section to prevent their sliding or being bounced off the truck in transit. If these ends of the two pendant lines came out of that position and slipped off the boom section as the crane swung it from the truck it would have made plaintiff’s end of the boom section lighter. Robillia and Laborde say that the end of the section next to the cab went up in the air. There is no explanation of any reason why that end of the boom section would go up in the air. Some witnesses say that the ends of the pendant lines at the rear of the truck fell off the section and some say that the ends of the pendant lines next to the cab of the truck came loose and fell off. We seriously doubt both of those statements. While there is no positive testimony to this effect, by interpreting what was said, what we believe happened is that the loose ends of the pendant lines next to plaintiff very probably slid to one side of the boom section when the crane operator made the second start to lift the section off the truck, thereby placing more weight on that side of the boom section. This may have shifted or shaken the other end of the boom section next to Robillia and Laborde sufficient to cause the sling line at that end to come loose from the bar or frame to which Robillia and Laborde had attached it, and that the reason it came loose was very probably the fact that Robillia and Laborde did not fasten it properly and securely.
Mr. Laborde’s further testimony with reference to the arrangement of the section *519 and the pendant lines on the truck and their condition when received at the site from defendant, Crane Service, was in complete agreement with the testimony of plaintiff and Mr. Robillia that these items were loaded on the truck in a proper and usual manner. He said he was careful about safety factors and that there was no dangerous condition apparent on' this instance. He checked the pendant lines when he got on the truck and presumed that Mr. Robillia checked them also and he found that the lines appeared to be secure.
Mr. George Joseph Vallee, an employee of Maritime and a witness for plaintiff, was standing on the ground opposite the cab of the truck on the driver’s side. He was there to unhook the sling lines from the boom after it would be placed on the ground. He said he saw the pendant lines on top of the boom section on the truck before it was lifted and he saw nothing wrong with the arrangement. The end of the pendant lines next to the cab where he was standing were not pinned into the lugs on the boom section but were tucked down into the frame of the section. That was the end of the pendant lines which had fallen off in the lifting. After the accident the ends of the lines at the front of the truck were on the ground. The other ends of the pendant lines were still tied with bailing wire at the other end of the boom (the end at the rear of the truck next to plaintiff). At the time the crane picked up the boom to swing it all the way off the truck, “the load shifted, causing the forward end of the big boom section to flip the hook on the top.” He did not see anything that could have happened to “cause the end of that boom section by the cab to lift up.” He explained further that the crane, “lifted up and the load shifted and cocked-like to the driver’s side of the truck and then the pendant was falling off and the thing went up.” He was asked:
“Q. You said the pendant lines did what?
“A. Shifted to one side and caused the load to come up.
“Q. Did the pendant lines stay up there or move over to the side?
“A. Well, they came off to the ground.”
Mr. Vallee said he had been doing that kind of operation for 10 to 12 years; that sometimes when the load came on the truck the pendant lines are fastened to the boom section with shackles which are fixed attachments, and sometimes they come tied with wire in the same manner as on this occasion; that if he had been on the truck to unload the section he would have done exactly as Robillia, Laborde and the plaintiff did on this occasion. He saw nothing unsafe about the arrangement. On some occasions he had used a safety check with which to fasten the sling or spreader lines to the boom section, but those then being used did not have a safety check on the sling line hook.
Mr. Vallee’s testimony placed the loose ends of the pendant lines as they lay on ' the section on the truck at the end of the section next to the cab of the truck and said the other ends of the lines (at the rear next to the plaintiff) were tied to the section with bailing wire. This is contrary to the other witnesses who placed the tied ends next to the cab.
August Gonzales, a Maritime employee and witness for plaintiff, was working on the ground about 35 to 50 feet from the truck. When he looked toward the truck he saw the pendant lines rolling off the boom and the boom started to fall. The boom section was being lifted and was then about two or three feet above the truck body. He said “ * * * when it reached a point over the top of the truck the lines started to roll off the boom and the boom shifted and the front cable (mean-1' ing spreader line) came out of that chuck off the boom and the boom hit the top of the truck and fell * * * ” He said these (pendant) lines moved to the left toward the driver’s side and when they did the boom section rolled to one side, came up and threw slack in the sling and the sling came out of the hook.
*520 Mr. Gonzales said he did not see anybody on the truck at that time and did not see plaintiff get hurt.
Stanley W. Vaughn was an employee of Maritime and was the foreman in charge of the men who were doing this unloading. When the accident happened he was walking away from the truck and was about 100 to 150 feet from the truck. He heard someone holler, “look out.” He turned and saw the boom come off the front end of the truck on the side opposite him. He first saw plaintiff Ryan as he “came through the air from the back end of the truck.” He said Ryan had worked for him a number of years and had much experience in this type of operation. Also that anyone doing this type of work who saw any condition or any loose ends that would be expected to cause trouble, it would be proper procedure and his duty to fasten it down. After the accident one end of the pendant lines was still on the boom section and the other end was on the ground. The end of the lines, which had come off the boom to the ground, was the end next to the cab of the truck. The other end next to Ryan toward the rear of the truck was still tied to^ the boom by the wire. He said he is not sure whether they had unloaded other sections before this accident on that day but they unloaded some after the accident and they made no change in their manner of operation.
Mr. Vaughn and all other witnesses testified that those engaged in this unloading operation were Maritime employees and were in complete charge of all those doing the unloading. The truck driver who brought the load to the site for defendant Crane Service had nothing to do with unloading the materials. The small crane used to lift the section from the truck had been rented with an operator by Maritime from Crane Service. Attorneys for both parties agreed that there is no question of borrowed servant to be considered in this case.
Counsel for plaintiff charge defendant Crane Service with negligence in not securely attaching the pendant lines to the boom section before the load left Crane Service premises. These lines were heavy. They were tied at one end of the boom section on the truck with wire. The other end was draped into the frame of the section to keep the lines from sliding off the truck. This was the usual way to do^ it. It was shown that sometimes the lines are fastened into the lugs on the boom section with cotter pins and counsel argue that the failure to do that in this instance was the proximate cause of the accident. All of plaintiff’s witnesses were men of many years experience and they all testified that such a method is not the only way to do it.
We conclude that the lines could have been placed flat on the bed of the truck or wrapped around the boom section. We assume that the main reason the lines are tied to the top of the boom section at one end with the other end draped into the frame of the section is to keep them from sliding or bouncing off the truck in transit. The manner of unloading the lines and section is entirely a matter by choice by Maritime employees. They could easily have untied the wires fastening one end of the lines and could have lifted the pendant lines first off the truck before moving the boom section. If they wanted to move the boom section with the lines on top, it was strictly their duty to determine the safety of such a move, and if they thought the wire attachment was not safe enough they could have fixed it some other way. It was the duty of Crane Service to deliver the property, not to assemble it. We believe that there was no negligence on the part of Crane Service. Counsel’s argument does not suggest any defect in the manner in which the parts were manufactured. Plaintiff cannot be heard to complain about the method employed in hauling the parts on the loaded truck to the site.
The only issue in this case is one of fact. Plaintiff was seriously injured and we have studied the testimony with great care. *521 There is no error in the decision of the trial court.
 It has been repeated so many times in court decisions that it is almost a trite expression to say that the plaintiff has the burden to prove his case by a preponderance of the evidence. In this case there is no dirth of testimony but there is not one word that even creates the slightest impression or indication that Crane Service committed any act of negligence. In a case when negligence is the issue, involving individual conduct, judgment, knowledge and experience, it must be shown that the party charged committed some act in a negligent, indifferent or careless manner, or neglected or failed without good reason to do something that the party is obliged to do, which act or which neglect results in damage to another, it is necessary to look to the applicable, established custom and requirements of the trade or activity in which the parties are engaged and to give common sense consideration to all of the circumstances. Following this rule, the judgment must be affirmed.
For these reasons the judgment appealed from is affirmed, the costs to be paid by plaintiff.
Affirmed.