348 So.2d 219 (1977)
Douglas P. FAULK, Plaintiff-Appellee,
v.
POWER RIG DRILLING COMPANY, Defendant-Appellee,
Lamb Industries, Inc., Defendant-Appellant,
The Northern Assurance Company of America, Intervenor-Appellee,
Odell Vinson Contractors, Third-Party Defendant-Appellee,
Employers Fire Insurance Company, Third-Party Defendant-Appellee.
No. 6064.
Court of Appeal of Louisiana, Third Circuit.
June 30, 1977.
Rehearing Denied August 1, 1977.
Writ Dismissed October 26, 1977.
*220 Mouton, Roy, Carmouche & Hailey by John A. Bivins, Lafayette, for defendant-appellant.
McHale & Bufkin by Louis D. Bufkin, Lake Charles, for plaintiff-appellee.
Plauche, Smith, Hebert & Nieset by Allen L. Smith, Jr., Lake Charles, for third-party defendant-appellee.
Brame, Bergstedt & Brame by Joe A. Brame, Lake Charles, for defendant-appellee.
Davidson, Meaux, Sonnier & Roy by J. J. Davidson, III, Lafayette, for defendant-appellee.
Ryder & Deshotels by Alfred Ray Ryder, Oberlin, for defendant-appellee.
Before DOMENGEAUX, GUIDRY and ROGERS, JJ.
DOMENGEAUX, Judge.
This is a suit for personal injuries arising out of an oil rig accident which occurred in Allen Parish on February 19, 1974. Douglas P. Faulk sued Power Rig Drilling Company, and Lamb Industries, Inc. The Northern Assurance Company of America intervened. Lamb Industries, Inc. third-partied Faulk's employer, Odell Vinson Contractors, Inc. and its insurer, Employers Fire Insurance Company. Before the case went to trial Faulk settled with Power Rig and Northern Assurance, Power Rig's workmen's compensation insurer.
The case was tried before a judge, who held for plaintiff and against Lamb Industries, Inc., in the amount of $834,763.89. Third party demands by Lamb against Odell Vinson were rejected. Lamb appealed. Plaintiff answered the appeal, asking for an increase in the award. We affirm the decision of the district judge.
Early in the morning of February 19, 1974, around two or three o'clock, a. m., Douglas P. Faulk was working as the pusher of a roustabout crew at Power Rig No. 12, a well owned by Tesoro Petroleum Company. Power Rig Drilling Company was the company assigned to do the drilling. Lamb Industries, Inc., provided the casing crew which lowered the casing (pipe) into the well. Faulk's roustabout crew, employees of Odell Vinson Contractors, Inc., were unloading the casing from the pipe rack situated at the foot of the rig. The catwalk or wooden platform was bordered on each side by pipe racks. The pipe was rolled by Faulk's crew onto the catwalk, one joint of pipe at a time. Once a joint of pipe was placed on the catwalk, Faulk would tie on an air hoist line so that the pipe could be lifted into the V-door, a metal slide which leaned diagonally against the rig floor. A stairway leading up to the rig floor abutted the V-door. After the pipe was hoisted into the V-door, one of the Lamb Industries casing crew, Leeward Meche or Eugene M. Meaux, would remove the air hoist line and tie on the pickup line, which is attached to a travelling block. Upon a signal from Meche or Meaux, who were standing on the rig floor, the pipe would be hoisted up and out of the V-door and down into the hole to be connected to the previous joint of casing. The signal consisted of taking up the slack in the pickup line.
In the meantime, the air hoist line would be lowered back down to the catwalk where Faulk would tie it on to the next joint of casing.
*221 This was a rhythmical procedure which lasted from one and one-half to three minutes for each joint. Occasionally a delay would occur and the pipe would stay in the V-door for a little longer period. On just one such occasion, while the previous joint lay in the V-door, Faulk began to tie on the air hoist line to the next joint. While Faulk was bent over in an awkward position near the above mentioned stairway, the pipe in the V-door was lifted by the driller. It slipped and hit the pipe Faulk was working on, sending Faulk head first into the metal hand rail of the stairway. Faulk's skull was crushed.[1]

OPINION
The trial court concluded "that the sole and proximate cause of Faulk's injury was the negligence of Leeward Meche". Meche was the Lamb employee who stood on the rig floor and gave the signal for the driller, Franks, to hoist the pipe out of the V-door. The trial court further opined "that Meche had the duty to ascertain that Faulk was not in the way before he signalled Franks".
There is conflicting testimony as to this alleged duty of Meche. Mr. Buckalew, the Power Rig toolpusher who supervised the operation, and the only eyewitness to the accident, testified that it was Meche's duty to make sure the catwalk was clear before giving his signal.
On the other hand, Mr. Stockstill, defendant's expert on drilling operations, said Meche had no responsibility to act as a lookout. He testified that Meche must take care for his own safety, and that Faulk had no reason to be where he was at the time of the accident.
Mr. Begnot, the plaintiff's expert driller, contradicted Mr. Stockstill by saying it is the duty of the man in the V-door to act as a lookout.
Where there is a conflict in the testimony, reasonable evaluations of credibility and inferences of fact should not be disturbed upon review. Canter v. Koehring Company, 283 So.2d 716 (La.1973). We see no reason here to disturb the trial court's findings of a legal duty on Meche's part to act as a lookout under the facts of this case. Faulk was in no position to see the driller nor could the driller see Faulk. Meche was the only person able to prevent this accident as he could see both Faulk and the driller. We feel that he could have taken the small amount of time needed to check the catwalk before giving his signal without unduly delaying the operation or risking his own safety.
The trial court also discussed Faulk's possible contributory negligence, as follows:
"First of all, the court was not presented with any evidence that Faulk was doing anything other than his routine work or that he was in a position other than that which the performance of his work required of him . . ."
We reiterate that this was a rhythmical procedure in which Faulk relied on Meche's signal to keep the operation flowing safely and smoothly. In order for plaintiff to be held contributorily negligent, the defendants must show that plaintiff not only had knowledge of the danger, but also that he appreciated the danger under all the surrounding conditions and circumstances. In light of the fact that Faulk had been relying on Meche for some time and quite successfully so, we find no reason to find that he was aware of any danger. He was simply continuing his work as he had been doing for the preceding few hours.
We agree with the trial judge that defendant, who carries the burden of proof, has failed in his burden. Although the testimony of one expert indicated that Faulk was contributorily negligent, apparently the trial judge was not impressed that Faulk was doing anything other than what he was supposed to be doing at the time. Considering the paucity of evidence to prove this claim, we find no manifest error in the trial judge's finding of no contributory negligence.
The district judge continued:

*222 "Even if it were decided that he negligently placed himself where he was when the pipe hit him, the conclusion that Meche's negligence was the sole and proximate cause of the accident is not altered. Faulk was in his perilous position before Meche signalled Franks. Meche, thus had the last clear chance to avoid the accident. Moses v. Commercial Standard Insurance Co. [La.App.], 174 So.2d 682."
Because we find no contributory negligence on Faulk's part, there is no need to discuss the "last clear chance" doctrine.

QUANTUM
Mr. Faulk's injuries were devastating. Doctor Foster, his surgeon and the primary treating physician, testified that he was quite surprised that plaintiff survived the operation on his skull and brain. Plaintiff stayed in the hospital for two months subsequent to the accident. He had lacerations of both frontal lobes of his brain, and is now missing one-fourth of the right frontal lobe. This injury has the same approximate effect as a frontal lobotomy. The part of his brain which was injured affects his personality, judgment, behavior, and ability to get along with people. The part of his brain which controls his reading, writing and motor skills was not injured. However, plaintiff's motor abilities have been affected because he is subject to grand mal epileptic seizures caused by his injury.
Plaintiff is severely depressed and emotionally unstable, partially because of his unhappiness with his physical appearance. He is blind in one eye, which is also horribly disfigured; he is severely scarred and has a plate in his head. The majority of the medical testimony indicates a great uncertainty that plaintiff will ever work again, especially because of his seizures. We conclude that the trial court did not err in finding plaintiff totally and permanently disabled.
Faulk was 24 years old at the time of the accident, was married and had children. (Since the accident he and his wife have separated due to Faulk's erratic behavior.) Faulk was earning $198.40 per week. He had a work life expectancy of 37.9 years. The actuary, Doctor Chisolm, valued Faulk's claim for future income loss at $494,018.41. The trial court, after considering many factors including inflation and productivity wage increases awarded $400,000.00 for lost future wages. We find no error in this award. See generally Economic Variables in Personal Injury Cases, Recent State Court Developments, Volume XXIV, Louisiana Bar Journal, Issue No. 2 (September 1976) for a discussion of factors used by our courts in deciding quantum and loss of future wages. For the earnings lost up to the time of trial the court awarded $20,448.39, in which we see no error. Medical expenses both past and future of $32,555.50 were awarded.[2]
For the extreme physical discomfort and disfigurement suffered by plaintiff the trial court concluded $175,000.00 would be adequate, and for his emotional distress the trial court awarded $200,000.00. Upon reviewing the record and the evidence of the severity of this injury, we cannot say the trial court erred. See Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977).
Plaintiff in his answer to the appeal requested that the award for loss of future wages be increased to $494,018.41, the value estimated by Doctor Chisolm. The district judge carefully analyzed the expert testimony presented by both sides, and our review thereof indicates that his award of $400,000.00 for that item was well within his discretionary powers.
For the above and foregoing reasons, the judgment of the district court is affirmed. Costs are assessed against defendant-appellant, Lamb Industries, Inc.
AFFIRMED.
GUIDRY, J., dissents and assigns written reasons.
*223 GUIDRY, Judge, dissenting.
Although I have the utmost respect for the conclusions reached by my brethren of the majority and in spite of my total sympathy for plaintiff I am unable to agree to an affirmation of the trial court judgment. In my opinion, the record in this case clearly supports a finding that plaintiff was contributorily negligent; the "last clear chance" doctrine is inapplicable; and, plaintiff's demand should have been rejected.
The defendant, Lamb, pleaded contributory negligence as a bar to the plaintiff's recovery. Defendant contended that plaintiff's contributory negligence consists in his being on or near the catwalk attempting to tie the "air-hoist" line to a joint of casing, which was situated partially on and partially off the catwalk, while a joint of casing was lying in the V-door subject to being hoisted to the rig floor at any time. In other words defendant contends that it was negligence for Faulk to have been where he was attempting to do what he was doing while a joint of casing was lying in the V-door and until such casing is all the way up on the derrick floor. The trial judge rejected this contention and stated:
"First of all, the court was not presented with any evidence that Faulk was doing anything other than his routine work or that he was in a position other than that which the performance of his work required of him. Even if it were decided that he negligently placed himself where he was when the pipe hit him, the conclusion that Meche's negligence was the sole and proximate cause of the accident is not altered. Faulk was in his perilous position before Meche signalled Franks. Meche, thus had the last clear chance to avoid the accident. Moses v. Commercial Standard Insurance Co. [La.App.], 174 So.2d 682."
My brethren of the majority agree with the trier of fact and therefore find no need to discuss the "last clear chance" doctrine. After careful study of the record I find that I am unable to agree to an affirmation of the trial court's ruling on these issues.
As previously mentioned the trial court found that Faulk was doing routine work and that he was not in a position other than that which his work required of him. The record simply does not support this conclusion. Quite to the contrary, all of the evidence in the record, including that of plaintiff's own experts, supports the factual conclusion that plaintiff should not have been attempting to attach the "air hoist" line to a joint of casing on and/or in close proximity to the catwalk while a joint of casing was lying in the V-door. In this connection I mention the fact that plaintiff was the "pusher" (foreman) of the roustabout crew sent to the Tesoro job, which was an experienced crew according to the testimony of Herman Vinson. (Tr. pgs. 770 et seq).
Mr. Foy D. Buckalew, toolpusher of Power Rig on the Tesoro job who testified as plaintiff's witness stated:
". . .
A. Well, I saw him, that's where I saw him.
Q. Mr. Buckalew, weren't you surprised to see him there?
A. Yes, sir, I sure was.
Q. In fact, weren't you surprised to see him in an area where if anything happened to that piece of pipe he would be struck by it?
A. Yes, sir.
Q. Didn't you expect to see himif you did at the time, didn't you expect to see him out of the way of the piece of pipe that was being lifted up into the rig so that if anything happened to it he would be out of its way?
A. I would expect it if the pipe is picked up, yes, sir." (Tr. pg. 804)
. . . . .
Q. Actually the normal situation is that from the time the previous joint is tied onto, there would not be anybody there, right?
A. Normally, there wouldn't no, sir.
Q. And from a standpoint of conducting the work, Mr. Buckalew, there is no need for anybody to be in the catwalk area at the time when you are preparing to lift the joint into the *224 riginto the derrick with the pickup line, isn't that correct?
A. Under normal procedure, yes, sir." (Tr. pgs. 825 and 826).
In connection with Mr. Buckalew's testimony there is no evidence which would even suggest that anything other than normal procedure was being followed or that some circumstances required a deviation from normal procedure.
Mr. Ecle Franks, who was the driller on the job at the time of accident and an employee of Power Rig, another of plaintiff's witnesses, stated:
"Q. As far as you knew, there was no reason for anyone to be there, is that right?
A. No, that's right, because I wouldn't have picked it up if I would have knowed there would be somebody there to get hurt." (Tr. pg. 837).
Stanley Stockstill, defendant's expert, testified that the normal and usual procedure in such cases is that no attempt is made or should be made to tie on the "air hoist" line until the casing lying in the V-door has been picked up into the derrick and the bottom portion clears the derrick floor. (Tr. pg. 958). Although the trial court rejected Mr. Stockstill's expert opinion in part (as to the duty and signal of the casing crewman) there is no evidence in the record from plaintiff's lay or expert witnesses to contradict this portion of his testimony. Rather, their testimony agrees with his on this score. In speaking to the reason why the area of the catwalk should be cleared when casing is in the V-door Stockstill stated (Tr. pg. 958):
". . . And that pick-up line is always subject to coming off, there's always the possibility that the casing that's being hoisted into the derrick can hit something and it will fall back down that ramp and slide down that catwalk. I've seen that happen . . ."
Perhaps even more convincing is the testimony of plaintiff's own expert witness, Mr. Wilfred J. Begnot, Driller for Power Rig, who testified as follows:
"Q. It is also the duty of the people working on the catwalk to be out of the way, isn't it, Mr. Begnot?
A. Yes, sir.
Q. The people working on the catwalk should, whenever that pipe is hitting (sic) in the V-door, should be out of the way of it until it's all the way upon the derrick floor, shouldn't they?
A. Yes, sir." (Tr. pg. 1007).
And then again Mr. Begnot reiterated this position with positivity at Tr. pg. 1015:
"Q. Mr. Begnot, you were asked a minute ago whether the man down on the catwalk in ordinary operations should not move out onto that catwalk or be on the catwalk while the joint of 10¾inch casing is being hauled up into the derrick by the block. You said, `Yes, that's true'.
A. He shouldn't be there, right."
On the basis of the above evidence, which I find uncontradicted and supported by witnesses for both plaintiff and defendant, I would find plaintiff's action in positioning himself on the catwalk and attempting to tie the "air hoist" line to a joint of casing while another joint of casing is lying in the V-door subject to being hoisted at any time, negligence which clearly contributed to plaintiff's tragic and unfortunate accident. I would also reject plaintiff's contention that the "last clear chance" doctrine is applicable, finding that, among others, the first element thereof, i. e., "That plaintiff was in a position of peril of which he was unaware or from which he was unable to extricate himself" is lacking. Clearly, plaintiff, the "pusher" of this roustabout crew, was aware or certainly should have been aware of his peril and/or clearly he was able to extricate himself from this peril by simply removing himself from the area of the catwalk until the casing had been lifted from the V-door and on to the rig floor. Having found this element lacking I would deem it unnecessary to consider applicability of the other elements necessary for imposition of the doctrine.
For the above and foregoing reasons I respectfully dissent.
NOTES
[1] The entire process of the casing operation was clarified by a 16 millimeter film admitted into evidence and viewed by the court.
[2] $25,000.00 of this had previously been awarded to the workmen's compensation insurer, Northern Assurance Company of America, by way of settlement.