361 So.2d 911 (1978)
Robert M. DUPAS, Jr.
v.
CITY OF NEW ORLEANS, Travelers Insurance Company and William O. Brown.
No. 8060.
Court of Appeal of Louisiana, Fourth Circuit.
June 30, 1978.
Rehearing Denied September 12, 1978.
Writ Refused October 26, 1978.
Gerald P. Aurillo, Metairie, for Robert M. Dupas, Jr., plaintiff-appellant.
Jones, Walker, Waechter, Poitevent, Carrere & Denegre and James L. Selman, *912 II, New Orleans, for Travelers Ins. Co. and co-counsel for City of New Orleans and William O. Brown.
Gerald A. Stewart, Asst. City Atty., co-counsel for City of New Orleans and William O. Brown, defendants-appellees.
Before SAMUEL, GULOTTA and BOUTALL, JJ.
BOUTALL, Judge.
Plaintiff, Robert M. Dupas, Jr., instituted suit seeking damages suffered by him when struck by an automobile owned by the City of New Orleans and operated by New Orleans Police Officer William O. Brown. Plaintiff sued the City of New Orleans, Brown, and Travelers Insurance Company, the liability insurer. The trial court found no liability and dismissed plaintiff's suit and we affirmed. Dupas v. City of New Orleans, 346 So.2d 322 (La.App. 4th Cir. 1977). The Supreme Court of Louisiana reversed the dismissal of plaintiff's demands and remanded the case to us in order to fix the damages to which plaintiff is entitled. Dupas v. City of New Orleans, 354 So.2d 1311 (La.1978).
The facts surrounding the accident are stated and discussed in those previous decisions. Suffice it to say that on October 15, 1973, Dupas, a pedestrian, was struck by the police vehicle and thrown on the hood of the car. When the car stopped, Dupas rolled off of the hood onto the concrete pavement. As a result of this collision, Dupas suffered severe head injuries and it was noted that he was unconscious and bleeding from his ears and mouth.
Dupas was taken to Charity Hospital in a police emergency vehicle and was immediately examined by doctors there who determined that he was suffering a closed head injury with considerable brain damage and needed immediate operation. Dr. David G. Kline, a neurosurgeon, carried out a partial lobectomy of the left temporal lobe of the brain, removing the most swollen and contused portion of the brain to allow room in the cranial cavity for the remainder of the brain. Dr. Kline estimated that he removed a portion of the brain approximately the size of his fist and that it constituted approximately 8 to 10% of the brain overall. Dr. Kline noted that the brain injury was not confined to that portion that he removed, but that there was overall damage to the brain, which was the main cause of the overall lasting effects suffered by Dupas.
The operation was successful, and Dupas remained in a coma for the next several days in critical condition. Under Dr. Kline's treatment, he regained consciousness, and it was determined that he suffered right-sided hemiplegia or paralysis, and that he had a significant degree of aphasia, a speech impairment. Under continued care, plaintiff began a rather remarkable recovery, reducing his right-sided hemiplegia to right-sided hemiparesis and showed continued improvement in his ability to speak.
On November 6, 1973 Dupas was transferred from Charity Hospital to Hotel Dieu for treatment and remained there until December 16, 1973. While there he was treated mainly by Dr. Patricia Cook, a neurologist whose diagnosis was the same as Dr. Kline's and noted that Dupas was suffering from severe brain injuries, aphasia and right hemiparesis. Plaintiff's physical therapy was increased, and he continued to improve, gradually reducing the right-sided weakness and arkwardness and improving in speech.
From Hotel Dieu, Dupas was transferred to the L.S.U. School of Medicine Rehabilitative Center where he remained an inpatient for three months and continued improvement. He was then discharged as an inpatient and treated at the Center as an outpatient for five months subsequent.
In October, 1974, Dupas was referred to Dr. Raeburn C. Llewellyn, a neurosurgeon, for evaluation and further treatment. He found that Dupas had an awkward gait, which affected his balance, spasticity in the lower limbs, some reduction of dexterity in the right arm and fingers, and that he exhibited a flattened personality, showing lack of interest in his surroundings and no *913 inclination to inaugurate conversation or continue with one. His diagnosis was that Dupas was suffering an organic brain syndrome based on severe brain damage as a result of the trauma. Dr. Llewellyn last saw plaintiff on March 18, 1976. On this occasion he found some slight improvement, but basically his condition remained the same with the exception that he noted some effect on the lower facial muscles of Dupas on the right side.
In the interim Dupas attended Dr. Max E. Johnson, a neurologist/psychiatrist for evaluation and treatment. Dr. Johnson also found that Dupas' speech was slurred and he had some trouble articulating. He was disoriented timewise, walked slowly and stiffly with his right leg and exhibited slow, awkward movements with his right arm. He too diagnosed that Dupas was suffering from a post-traumatic cerebral brain syndrome with expressive and sympatic aphasia, moderately severe intellectual and memory impairment, and personality changes. In connection with his treatment by his doctors during this period, Dupas was examined and tested by several psychologists and speech therapists, and beginning on December 3, 1975 undertook speech therapy at New Orleans Speech and Hearing Center.
In summary, the medical history of plaintiff is consistent from doctor to doctor and there is basic general agreement amongst them as to the cause of Dupas' injuries and the residuals he suffered. Plaintiff continues to have the right-sided weakness and awkwardness and the impairment in his speech and memory, together with a marked personality change. The medical evidence is that he is incapacitated from work except under sheltered conditions with close supervision and that the only type of job he could possibly hold would be with some type of rehabilitative program. There is only a slight chance of improvement in his condition and that mainly in the area of his speech impairment. We conclude that he is presently disabled and will be permanently disabled for the rest of his life.
The problem that concerns us here is the fixing of damages for the injuries received and the resulting disability. In Louisiana damages are compensatory in nature and this case presents problems not ordinarily found in damage suits. Dupas' lifestyle prior to the injury was not that of the so-called "ordinary man" that courts usually use as a standard for a comparison in assessing damages.
The evidence shows that prior to the accident, Dupas was able to work, and that after the accident he is not able to work and produce income. At the time of the accident Dupas was unemployed, but had been employed by Avondale Shipyards, Inc., prior to the accident from June 26, 1973 through August 7, 1973 as an electrician's helper at the rate of $3.35 per hour. Plaintiff asks us to use this most recent employment as a basis for computing lost wages. He introduced evidence to show that at this rate a normal work year would produce a total income of $8,929.96 per year. He would thus have lost from the date of the accident, October 15, 1973 to January 1, 1976, wages to the extent of $19,748.95. His age was 27 at the time of the accident and his work life expectancy would have been 35.1 years to age 62.1. His life expectancy was computed at 42.9 years to age 69.9. Using various formulae involving future increase in productivity, inflation rate and discount rate, his loss of future income would range from a low of $142,009.70 to a maximum of $377,942.52. However, we cannot agree with any of the proposed amounts.
In computing damages in this case we find it necessary to rely upon the prior life history of Dupas because we believe it demonstrates a more accurate picture of his actual income loss. His work record apparently began with Avondale from April 12, 1962 to January 29, 1963 when he was discharged for having been absent from work. This was to form a typical pattern of his work history and for the next ten years prior to the accident he worked for numerous employers for a short period of time before leaving for one reason or another.
*914 His work history can perhaps be best summarized by his tax returns which were introduced into evidence and show that in 1966 he earned $1,085.16 at four different places of employment; that in 1967 he earned $1,335.95 at three different places of employment; that in 1968 he earned $1,939.78 at one place of employment; that in 1969 he earned $2,234.36 at one place of employment; that in 1972 he earned $1,071.25 at two different places of employment; that in 1973 during the nine months prior to the accident, he earned $3,518.03 at three different places of employment. The evidence further discloses that during the earlier portion of that time, he was addicted to drugs and supported himself by theft and burglary in between the short periods of gainful employment. He was convicted of a felony and imprisoned at the Louisiana State Penitentiary. After his release, he continued this lifestyle, and was committed to the Louisiana State Hospital at Mandeville for psychiatric treatment, for a manic-depressive type of schizophrenia. At the time he was in Mandeville, a detainer was placed upon him by authorities in Jefferson Parish for possession of stolen property. It should be noted that his commitment to Mandeville was preceded by an episode wherein he threatened to kill himself, his wife and children, and pistol whipped his wife.
Whether his prior problems were due to drug addiction, or whether his drug addiction was merely a symptom of other deeper psychological problems, we do not know. Suffice it to say that his lifestyle was such that he only worked intermittently at best. We note, for example, that in September, 1970, he was hospitalized at Charity Hospital for viral (serum) hepatitis which he apparently contracted from an unsterile syringe used for a Heroin injection, causing his incapacity for some time. Nevertheless, in his favor we must state that the evidence indicates an attempt on his part to rehabilitate himself in the year prior to the accident, which was partially successful. Coupled with his work history, we further consider that Dupas, by education and training, could only perform general labor or semi-skilled labor. While it is possible that by diligent application, he could have increased his skills, his life history does not indicate the probability of that occurring.
Considering these factors enumerated above, we cannot fix Dupas' loss of wages with preciseness. Based upon his most recent work experience prior to the accident, perhaps his most favorable year, we can only conclude that he would produce only one half of the income per year that he was capable of producing, and instead of using his yearly estimated full time income from Avondale of $8,929.96 per year, we would fix his loss of income at $4,464.98 [1] annually. Accordingly, we would award him lost wages for the period October 15, 1973 to January 1, 1976 in the amount of $9,874.48. In fixing loss from future wages, we accept his work-life expectancy to age 62.1 and consider his income would increase by 3% per year with a discount factor of 5% per year, and reach a total of $104,249.17.
We next approach the measure of general damages that should be awarded to Dupas as compensation for the injuries he suffered. We have already discussed his medical history caused by the severe brain injuries he received, resulting in an organic brain syndrome, aphasia and right hemiparesis, demonstrating awkwardness of gait and use of the right side, lack of dexterity, lack of interest in his surroundings and a change in his activity pattern from an active person to a rather withdrawn, disinterested and retiring individual of low normal intelligence. We have also mentioned above his criminal and anti-social behavior. While it might be said from some abstract point of view, that the change in Dupas' lifestyle is an improvement insofar as society in general is concerned, nevertheless we note that his disabilities are such that he will be handicapped throughout the rest of his life and that he will need the care of *915 someone watching over him in general. We are not disposed to award him any amount for his alleged loss of cohabitation and companionship of his wife, because the evidence shows that his previous lifestyle was such that he enjoyed no settled family life. We also note that the nature of his injuries is such that he suffered very little pain in the initial stages of his treatment, and he suffers none thereafter. We do consider that his residual disabilities will handicap him throughout his life span. We consider the sum of $50,000 to be adequate compensation.
In setting his special damages, we would award the following:
Hospital expenses including $2,879.65 for Charity Hospital, a total of $5,587.95; expenses of physicians and surgeons, $875.00; rehabilitation expenses, $585.00. Additionally we would note that the evidence indicates that he should continue his therapy consisting of three sessions a week at $15.00 each, in the amount of $2,340.00.
In this case there was testimony from a number of expert witnesses. We award the sum of $150.00 each for Dr. David G. Kline, Dr. Max E. Johnson, Dr. Patricia S. Cook, Dr. Robert A. McFarland and Dr. Raeburn C. Llewellyn. We award $75.00 each to Dr. Olin K. Dart, Dr. Jack Rosen, Dr. John Kullen, and Dr. John W. Chisholm. These amounts are taxed as costs. Finally we note that the liability of Travelers Insurance Company was stipulated to be the amount of its policy, $25,000.
For the reasons above assigned, IT IS ORDERED, ADJUDGED and DECREED that there is judgment herein in favor of Robert M. Dupas, Jr. and against the defendants, William O. Brown, City of New Orleans and Travelers Insurance Company, in solido, in the amount of $25,000 and that there be further judgment against William O. Brown and the City of New Orleans in solido in the amount of $148,511.60, all amounts with legal interest from date of judicial demand until paid. The expert fees are taxable as costs, and all costs are assessed against the above named defendants, including the City of New Orleans to the extent provided by law.
Damages fixed in response to remand.
NOTES
[1] This figure represents ½ of his estimated income and is consistent with his partial earnings for the year reflected in his 1973 income tax return.