375 So.2d 395 (1979)
Murray DAVIS, Jr.
v.
NEW ORLEANS PUBLIC BELT RAILROAD et al.
No. 9912.
Court of Appeal of Louisiana, Fourth Circuit.
August 21, 1979.
Corrected on Denial of Rehearing October 12, 1979.
Stephen R. Plotkin, Owen J. Bradley, New Orleans, for Murray Davis, Jr., plaintiff-appellee.
Wood Brown, III, New Orleans for New Orleans Public Belt Railroad et als., defendants-appellants; Montgomery, Barnett, Brown & Read, New Orleans, of counsel.
*396 Before SAMUEL, STOULIG and BOUTALL, JJ.
BOUTALL, Judge.
This is a tort suit for personal injuries resulting to plaintiff from an on the job accident brought against co-workers, executive officers and others for loss of a portion of plaintiff's left arm. The trial court awarded judgment against certain of the defendants in the amount of $862,048 and they have appealed. The trial judge presented detailed and well reasoned Reasons for Judgment and we quote his statement of the facts of the case as follows:

"FACTS OF THE CASE
"On June 4, 1974, Murray Davis, age twenty-one (21), who had been a probationary worker for about four months at the Bulk Cargo Terminal operated then by the Board of Commissioners for the Port of New Orleans, was working the 6:00 P.M. to 6:00 A.M. shift. Davis was a Bulk Terminal Worker I by Civil Service designation and his duties included loading and unloading various cargo, cleaning up, throwing switches, closing train doors and coupling and uncoupling cars.
"On this particular night, Davis spent several hours assisting in the loading of bulk sugar into freight cars at the sugar loading platform located between railroad tracks # 1 and # 2. The loading went on until some time after midnight. Then Davis and the other workers took their `lunch' break for approximately an hour.
"Apparently during this break, two things took place, though there is disagreement in the testimony concerning them. One occurrence was that Davis was ordered to go to the terminal `office' after lunch, and help Walter Alexis, another worker, in cleaning it up. The second was that someone told Davis that he was to be fired from his job at the end of the shift that morning.
"Davis went to the office after the lunch break and spent some time cleaning it up with Alexis. Then he left. According to his testimony, he was looking for his immediate superior, Foreman Paul Lucky, in order to find out about the `rumor' concerning his being fired, or to ask Lucky to talk with him with Burleigh Price, Operations Supervisor of the Terminal.
"Davis went to the vicinity of the sugar platform, and found another worker, Robert Barlow, closing doors on the sides of the cars facing the sugar platform. He assisted Barlow in closing a door and asked where Lucky was. Barlow's response is not made clear in the testimony, but when Lucky did not appear, Davis walked between tracks # 1 and # 2 for some one hundred (100) yards, still looking for him. He then crossed in a westerly direction over stationary coupled railroad cars and walked another fifty (50)-seventy-five (75) yards toward `the back of the yard', but still failed to find Lucky. He then started back, and as he crossed between coupled cars again, the train moved suddenly, and he was thrown beneath the wheels. His left arm was caught between the wheels of the boxcar and the rails and he suffered a traumatic amputation of the left arm.
"Davis' suit is against certain executive officers and fellow employees at the Bulk Terminal, among them the present Executive Director of the Port, the Deputy Director of the Port, who had previously been Safety Officer of the Board; The Assistant Superintendent of the Bulk Terminal, certain supervisors and foremen who stood immediately above him in the Bulk Terminal chain of command."
On this appeal, the appellants raise no issue as to the standing of each individual defendant to be held in judgment, but do contend that there is no negligence generally shown, and that the plaintiff assumed the risk or was contributorily negligent.
The statutory law, R.S. 23:13, requires that every employer shall furnish his employee a reasonably safe place in which to work, and requires that the methods and processes used in the employment shall be reasonably adequate to render the employee *397 safe from hazards. The liability of some of these defendants arises from a violation of that duty, as well as under the provisions of the general tort law, L.C.C. Article 2315. The trial court found that there were no established rules to control work at the terminal, there was no safety program for the workers, no training program or instructions given relating to the operation of the loading train and related operations. The train engine itself was operated by a man who received only the most rudimentary instructions as to how it worked and who moved the train on instructions from an office. When the train moved, there were no horns, whistles, bells or other signals given to alert any of the workmen that the train may begin to move. The engineer was limited to only a partial view of the area and could not tell if someone was in a dangerous position. The person controlling his movements was on the loading dock and he could only see at best less than one half of the operating area. The negligence of the various defendants is well established by the record.
The issues of contributory negligence of the defendant and assumption of risk are more closely contested. This workman was a probational worker who had been on the job only a couple of months and he had never received any safety training or admonitions as to the proper safety procedures. Obviously, of course, it takes no particular warning to impress any reasonably prudent adult that if he attempts to cross between the cars of a moving train, he is subject to serious injury. However, it must be remembered that these employees are engaged in constantly throughout their work period crossing tracks and performing operations in the loading and unloading of freight cars. The evidence shows that all employees from supervisors down, constantly crossed between the cars of stopped trains whenever the train was of such length as to require considerable inconvenience to circle around it. This particular train was of considerable length and had been stopped for quite some time because of the lunch break. Plaintiff was aware of its condition, and in fact had helped one of his fellow employees perform an operation in connection with the train. It is apparent that he had no knowledge that the train was about to move at the particular time he attempted to cross.
The test for contributory negligence is the same as for primary negligence and is that conduct which falls below the standard to which a person should conform for his own safety and protection, the standard being that of a reasonable person in like circumstances. Pfister v. Phoenix of Hartford Insurance Company, 290 So.2d 362 (La.App. 4th Cir. 1974). Additionally, if plaintiff fully appreciated the risk he was incurring and freely and voluntarily chose to incur it, then it can be said that he assumed the risk. In a case such as this, it is necessary to look at the applicable established custom and requirements of the trade or activity in which the parties are engaged and to give common sense consideration to all of the circumstances. Ryan v. B & G Crane Service, Inc., 210 So.2d 514 (La.App. 4th Cir. 1968). The burden of proving contributory negligence must be borne by the defendants, but in this case the facts show that not only have the defendants failed to carry that burden, but that the evidence preponderates in favor of plaintiff, and that he has met the tests noted above. Under the facts testified to by plaintiff, and specifically accepted as to credibility by the judge, the plaintiff was unaware that the train was about to be started up again and was unaware of impending danger. The proximate cause of this accident is the rather gross negligence of defendants in having the train start up again unexpectedly, without any warning or signals, and without ascertaining that workmen were clear of the train. This was a clear violation of the duty owed the plaintiff considering the risk involved in these operations.
The other issue seriously contended here is quantum. The trial court calculated the following damages:

*398 "The Court, therefore, calculates total special damages as follows:

Past loss of wages $ 12,643.00
Future loss of wages 161,982.00
Future replacement of prosthesis 20,775.00
Future psychiatric care 7,800.00
Future drug expenses 4,708.00
Future surgery & hospitalization 1,500.00
Future medical examination and care 2,640.00
 ___________
 TOTAL ...............$212,048.00

* * * * * *
"Therefore, the general damages will be as follows:

"Disfigurement and loss of use of left
arm, past, present and future $300,000.00
"Humiliation and embarrassment,
past, present and future 75,000.00
"Physical pain and suffering, past,
present and future 150,000.00
"Psychiatric disability and mental
pain and suffering, past, present
and future 125,000.00
 ___________
 TOTAL .............$650,000.00
"RECAPITULATION:
 "Special Damages $212,048.00
 "General Damages 650,000.00
 ___________
 GRAND TOTAL .......$862,048.00

The injuries upon which this award is based are the loss of a portion of the left arm and its sequelae. When Davis fell down between the cars of the train, one of the steel wheels passed over his left arm between the elbow and the wrist mangling it and leaving the lower portion connected only by a few tissues. Realizing his situation he finally managed to hold onto his left hand with his right hand and walk over to the office for assistance. After a short while he was taken to Methodist Hospital and admitted for treatment. He remained conscious during this period of time and obviously suffered excruciating pain as well as the torment of seeing his arm in that condition. Several hours of surgery resulted in the amputation of his left forearm. Six days later additional surgery was performed removing some dead tissue and placing wire sutures into the skin edges to close his wound. Four days later the wound was totally closed except for a small area left open for drainage purposes. During this time in the hospital plaintiff continued to suffer extreme pain and became extremely depressed and fearful about the condition of his arm. After some 16 days he was discharged from the hospital and returned home. His arm still continued to give him pain and he had trouble sleeping, and needed considerable medication. Noting the severe effect on Davis, the treating physician referred him to a psychiatrist. He had psychiatric treatment and continued with his medical treatment and the fitting of a prosthesis which caused additional problems with the stump of his arm.
The treating physician, Dr. Vecca, noted that despite his best efforts Davis continued to have problems and determined that he had developed a neuroma of the ulna nerve. Accordingly, he recommended another surgical procedure on March 28, 1976 and carried out an excision of the ulnar nerve neuroma. Davis then developed a median nerve neuroma and this again hospitalized him on December 5, 1976 for excision of that neuroma. This did not solve all of Davis' problems and he continued to suffer. In February 8, 1977 it was discovered that he had developed a hematoma in the area where the stump contacted the prosthesis. However Davis still complained of persistent pain in the same area in contact with the prosthesis and Dr. Vecca concluded that further surgery would be necessary to alleviate his condition. Davis still complains of pain in the area and it appears that he will continue to suffer some pain in the future.
Paralleling his medical treatment, he was treated by a psychiatrist for the severe depression he incurred, and had severe problems adjusting to the loss of his forearm and hand. It has caused him to feel something less than a complete man, and he is convinced that people stare at him whether he wears the prosthesis or not. This condition has caused him great difficulty in his efforts at rehabilitation. At the time of trial, he was still in need of additional psychiatric treatments.
At this time it should be noted that Davis at the time of accident was 21 years of age and had completed the 9th grade. Psychological tests indicated that he was at the level of low normal intelligence or slightly *399 below, dependent upon the opinion of the examiner. He had no particular skills and had worked only at jobs involving manual labor. After the accident he made several attempts at rehabilitation, the initial attempt seeming to be successful for a short time, but then developing unsuccessfully, resulting in his quitting the program. However later he was encouraged to begin again and has made some attempts at rehabilitation. During a portion of the time before trial, he worked as a clerk in a package liquor store but had difficulties doing that job. The picture thus presented at time of trial is that Davis will never be able to regain his former status, and will continue to have difficulties both in his private life and in employment for the foreseeable future. He must cope with not only the physical handicap occasioned by the loss of his forearm, but the mental problems which arose as a result thereof.
Faced with this picture, the trial judge made the award as detailed above. The trial judge considered each element of the special damages award and computed the amount of money reasonably necessary to compensate plaintiff for his expenses. We find his conclusions to be supported by the evidence and see no need to reiterate them here, except to comment briefly about the award for loss of wages.
Both parties dispute the award of loss of wages. Of course, such awards cannot be made with preciseness, but the award made by the trial judge is a reasonable award based upon the evidence. That award was based primarily upon the testimony of an economist and actuarial expert who calculated the pay that Davis would have been making in his employment by the Board of Commissioners for the Port of New Orleans, giving credit for income earned by Davis as a clerk in a liquor store prior to trial and using that figure to compute the total of past lost wages and future expected lost wages. As to the past lost wages, that was a relatively simple mathematical computation. We do note that there was a three month period during this time that Davis was in prison, and ordinarily we would feel compelled to reduce the amount for those three months. However, this is only three months out of a period in excess of three years and we are not certain that we can compute the loss of wages that precisely.
The award for future loss of income was based upon the expert's assumption that Davis would continue to work making the same $70.00 per week, based upon a work-life expectancy of 37 years. The total sum was discounted assuming an interest of 5%, adding a 3% inflation factor and a 3% wage increase factor. The sum was computed to be $161,982 and we affirm that award.
Passing now to a consideration of the general damages, we again note that the trial judge itemized the elements he considered pertinent arriving at a total of $650,000. We believe that award to be manifestly erroneous, and reduce it.
In making this determination we are cognizant of the jurisprudential restrictions placed upon our constitutional mandate to review cases on both law and fact, exemplified in the case of Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976) and the cases discussed therein. Reduced to its simplest terms, the question before us is whether we can conclude from a review of this record that the trial judge did not abuse its much discretion granted in L.C.C. Article 1934(3) in concluding that plaintiff was due for his injury the total sum granted. To that question we answer that this trial judge did. In his itemization of the general damages, we believe the trial judge duplicated portions of the award. Referring to the itemization we quoted above, we find little difference between an award for disfigurement and an additional award for humiliation and embarrassment for that disfigurement. Similarly, humiliation and embarrassment must certainly be an element in the psychiatric disability and mental pain and suffering which arises based at least in part on that humiliation and embarrassment. We do not understand the complete difference between physical pain and suffering and mental pain and suffering. Finally we comment that there must be *400 some interrelationship between the award for loss of use of the arm and loss of income because of that loss of use. In summary, we say that the award for this plaintiff has been increased beyond discretion by making separate awards for interrelated elements of damage which are to some extent duplication. Additionally, we believe this position to be supported by reference to awards made in a number of cases cited to us by both parties.[1]
Referring again to the case of Coco v. Winston, Inc. supra, we reduce the award to the highest point which is reasonably within the discretion afforded, to-wit, the sum of $425,000 for general damages.
Accordingly, we reduce the judgment rendered in favor of plaintiff and against the defendants from the sum of $862,048 to the sum of $637,048 and as thus amended, we affirm the judgment.
AMENDED AND AFFIRMED.
NOTES
[1] Appellant argues that the award is substantially more than previous awards for massive body injuries, citing Welton v. Falcon, 341 So.2d 564 (La.App. 1977); Wallace v. Pan-American Casualty Company, 352 So.2d 1048 (La.App. 1977); Faulk v. Power Rigged Drilling Company, 348 So.2d 219 (La.App. 1977); Willis v. Stauffer Chemical Company, 348 So.2d 158 (La.App. 1977); London v. Ryan, 349 So.2d 1334 (La.App. 1977); Anding v. Southwestern Insurance Company, 358 So.2d 690 (La.App. 1978); McKowen v. Gulf States Utility Company, 358 So.2d 675 (La.App. 1978).

Appellant further suggests that guide lines for similar injuries are furnished in cases of Cooksey v. Central Louisiana Electric Company, Inc., 279 So.2d 242 (La.App.1973); Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1977); Fusilier v. Russell, 345 So.2d 543 (La. App.1977); Dupas v. City of New Orleans, 361 So.2d 911 (La.App.1978).
In support of the award, the appellee refers us to the cases of McKowen v. Gulf States Utility Company, 358 So.2d 675 (La.App.1978); Polman v. Mohasco Corp., 371 So.2d 838 (La. App. 1978); Parfait v. State Department of Highways, 334 So.2d 549 (La.App. 1976); Cain v. Witco Chemical Corp., 341 So.2d 1220 (La. App. 1976); Lanclos v. Hartford Accident Indemnity Company, 366 So.2d 621 (La.App. 1978); Gordon v. General Motors Corp., 323 So.2d 496 (La.App.1975); Gregoire v. Hartford Accident Indemnity Company, 348 So.2d 186 (La.App. 1977); Faulk v. Power Rigged Drilling Company, 348 So.2d 219 (La.App. 1977); Outlaw v. Bituminous Insurance Company, 357 So.2d 1350 (La.App. 1978); Prevost v. New Orleans Public Service, Inc., 357 So.2d 1371 (La. App. 1978); Corollo v. Wilson, 353 So.2d 249 (La.1977) and calls particular attention to the case of Greene v. Wright et al., 365 So.2d 551 (La.App.1978).