358 So.2d 690 (1978)
Leo ANDING et ux., Plaintiffs-Appellees,
v.
SOUTHWESTERN INSURANCE COMPANY et al., Defendants-Appellants.
No. 6392.
Court of Appeal of Louisiana, Third Circuit.
April 11, 1978.
Rehearing Denied May 11, 1978.[*]
Writ Refused July 3, 1978.
*692 Kramer & Davis, James D. Davis, Alexandria, for plaintiffs-appellees.
Stafford, Randow, O'Neal & Smith, Grove Stafford, Jr., and Russell Potter, Alexandria, William J. Doran, Jr., Baton Rouge, for defendants-appellants.
Before WATSON, GUIDRY and FORET, JJ.
WATSON, Judge.
This is one of three consolidated cases arising out of an accident which occurred on Highway 399 in Vernon Parish on the afternoon of October 15, 1975. A loaded log truck driven by Clyde Ellis Clark collided with a Ford automobile driven by Mrs. Ora Mae Anding, wife of Leo Anding. The Anding grandchildren, Cody and Tonya, were passengers in the Ford; Tonya died in the accident; her brother and grandmother were injured.
In docket # 6390, La.App., 358 So.2d 699, George Elie Anding and Gwendolyn Lacaze Anding ask damages for the death of their daughter, Tonya Denean Anding, and the personal injuries of their minor son, George Decody "Cody" Anding. Named as defendants are Clyde E. Clark, his insurer, Southwestern Insurance Company and the Louisiana Department of Highways. In the instant case, docket # 6392, Leo Anding, et ux. v. Southwestern Insurance Company, et al., Mr. and Mrs. Leo Anding ask damages for Mrs. Anding's personal injuries, medical expenses, and loss of the Ford automobile from the same defendants. In docket # 6391, Clyde E. Clark v. Leo Anding, et ux., La.App., 358 So.2d 700, Clark is suing Mr. and Mrs. Leo Anding and the Department of Highways for damage to his truck and loss of income.
The trial court concluded that Clark was negligent in operating ". . . a monstrous vehicle over a narrow road on a rainy day near top speed and failing to apply his brakes . . ." timely (TR. 160); that the Highway Department was negligent in maintaining a slippery patchwork surface on Highway 399 without posting warnings or reduce speed signs; and that Leo Anding was negligent in having slick tires on the Ford automobile. Mrs. Anding's actions were stated to be those of a reasonably prudent driver. The demands of Clark in docket # 6391 were dismissed. In docket # 6390, George Elie Anding was given judgment against the Department of Highways, Clark and his insurer, in the sum of $36,566.23, including $1,566.23 for funeral expenses. Gwendolyn Lacaze Anding, former wife of George, was awarded $40,313.10, including $313.10 for Cody's medical expenses, and an additional $5,000 for Cody's use and benefit, against the same defendants. In the instant case, docket # 6392, Ora Mae Anding was awarded judgment against Clyde E. Clark and the Louisiana Department of Highways, in solido, in the amount of $200,000 and judgment against Southwestern Insurance Company in the amount of $100,000, its policy limits for injury to one person. The demands of Leo Anding were dismissed with prejudice. The Department of Highways was given judgment against Southwestern Insurance Company and Clark for one-half of the total, limited, as to Southwestern Insurance Company, to its policy limits of liability.
The Department of Highways has appealed, contending that: the Department was not negligent; any negligence in maintaining Highway 399 was not a proximate cause of the accident; Ora Mae Anding was negligent both in causing the accident and in driving with defective tires; Leo Anding's negligence in equipping the automobile with defective tires should be imputed to Ora Mae Anding; the damages awarded are excessive. Southwestern Insurance Company and Clark have appealed, contending *693 that: Ora Mae Anding was negligent; Clark was not negligent; any negligence on the part of Clark was not a cause in fact of the accident; the awards of $200,000 to Ora Mae Anding and $5,000 to George Decody Anding are excessive. Mr. and Mrs. Leo Anding have answered the appeals asking that her damages be increased from $200,000, the amount prayed for in their petition, to $600,000. They contend that the trial court should have allowed amendment of their petition to claim damages more in keeping with the evidence presented; that the award to Ora Mae Anding is so low as to constitute an abuse of the trial court's discretion; and that any negligence of Leo Anding in having slick tires on the Ford was not a cause in fact of the accident and should not bar his recovery of damages. The trial court stated in denying amendment of the pleadings that the $200,000 was sufficient. Also answering the appeal are the parents of the minors who ask that the award for the death of Tonya be increased to $100,000 for each of them.
Because of George's youth the only eyewitnesses who could testify as to the circumstances of the accident were Mr. Clark and Mrs. Anding. Mrs. Anding was going north, returning home to Pitkin from DeRidder where she had taken the two grandchildren to the health center. She testified she was not familiar with the highway. She came over the crest of a small hill going about 40 m.p.h. A slick place in the road caused the back of her car to wiggle out of line. She straightened out, observed Clark's truck coming from the opposite direction in her lane of traffic and checked her speed. There was a narrow bridge in the valley between the two vehicles. It was stipulated that the top of her hill was 870' from the bridge and Clark's hilltop was 543' from the bridge. The truck appeared to Mrs. Anding to be in the middle of the road and she pulled to the side to give the truck the right-of-way. Her right tire went off the roadway because of a rough spot in the blacktop. She then tried to pull her car back on the edge of the road surface. The car hit a slick place that caused her car to skid at an angle down the highway with perhaps a third of the car in the left lane of traffic. Mrs. Anding told the children the truck was going to hit them. Her car and the truck collided. Mrs. Anding testified that the truck did not appear to check its speed at any time prior to the collision. She thought it remained in her lane until the impact. Her husband was responsible for deciding on the purchase of new tires. She was not aware that her back tires were slick.
Clark was hauling wood from Kisatchie Forest to the DeRidder Boise Southern paper mill. His trailer was loaded with tree length wood, and weighed approximately 72,000 pounds, the legal maximum. It had not been weighed when the accident occurred. Clark was familiar with the road and had made the same trip earlier in the day. The roadway was narrow and wet with rain. It had been raining all day. He was driving in ninth gear at a speed of about 45 miles an hour, the truck's maximum when loaded. Clark topped a small hill and saw the Anding car coming from the opposite direction down another small hill. There was a bridge between them. Clark observed the Ford fishtail slightly then straighten out and pull to the side. The right front wheel dropped off the roadway. Clark said he stopped accelerating, but the grade kept his speed approximately the same. When the Anding car turned back to the highway it skidded across the roadway, and the vehicles collided. Clark first admitted that he did not apply his brakes until immediately before the collision, despite observing Mrs. Anding's difficulties. He then claimed when recalled to the stand that he braked when he saw her car drop off the road. The trial court noted this as an apparent conflict in reasons for judgment. Clark testified that he was in his proper lane of traffic. He estimated that he could stop his truck on a flat dry surface when fully loaded within two or three hundred feet but that it would take longer going downhill on a wet pavement. Clark said he thought Mrs. Anding was trying to avoid him. After the accident, Clark pulled Mrs. Anding and the two children *694 out of the car. Tonya breathed only a couple of times before expiring.
Donald R. Beltz of the Louisiana State Police investigated the accident. The vehicles had not been moved. The Anding Ford was 50 or 60 feet south of the bridge in the ditch on the righthand side of southbound motorists. It had come to rest about 84 feet from the point of impact at the north end of the bridge. The right front tire left 22 feet of skidmarks, the front left 19, the right rear 22 and the left rear 17. Trooper Beltz observed these marks north of the point of impact where Mrs. Anding had gone off the road with her right tires. The shoulder was firm slippery sod with no large holes. The right front tire on the Anding vehicle was in good shape but the others were slick. The log truck traveled 375 feet from the point of impact. Its pre-impact speed was estimated at 45 to 50 m.p.h. The truck left no skidmarks to indicate the brakes had been applied. Because of the absence of marks Trooper Beltz could not determine whether the truck was in its proper lane of traffic prior to the impact. There was a light rain and the blacktopped road surface was slick. However, Trooper Beltz patrolled the road often and had never had trouble maintaining control of his vehicle on it during rainy weather. Damage to the logging truck was in the front, more severe on the right side. The Anding vehicle was virtually destroyed on the passenger side. The right side of the truck had apparently struck the right side of the Anding car, as the latter went across the bridge at an angle. Trooper Beltz did not recall any warning signs in the area.
Joseph H. Barnwell, retired from Louisiana Tech, a professor emeritus in mechanical engineering, testified as an expert in accident reconstruction. Although not an expert in highway design, Professor Barnwell was found to qualify as an expert in the testing of road surfaces. He measured the pavement at the bridge as 19 feet wide and the highway as 21 feet wide. The bridge is 20'3" long. The truck was 8 feet and the Anding Ford was 6'5" wide. Barnwell compared photographs of the scene and identified a patchwork overlay of asphalt where Mrs. Anding's car came back on the roadway after running off the shoulder. The overlay patch is 51½ feet long and extends to within 13½ feet of the south end of the bridge. The surface of this patch was slick and smooth with no aggregate when Barnwell examined it. In his opinion, photographs showed its condition to have been substantially the same at the time of the accident. Barnwell testified that the patch could have become smooth and slick from being applied with an excess of asphalt. Warm weather can cause asphalt to bleed, and he examined the patch ten months after the accident but he believed its condition to be stable. Barnwell tested the road surface of the patch during a gentle rain and got co-efficients of friction of .29 and .31 or about .3 at 18 miles an hour, which is poor. The ratio would have gone down at a higher speed. The rest of the highway would have had a co-efficient of friction of .56 to .6. According to Barnwell's testimony, the State of Louisiana calls for ability to stop corresponding to a co-efficient of friction for automobiles of .57. The edge of the road was broken up and corroded with virtually no shoulder. Barnwell identified a break at the edge of the road which he testified would have caused a car which hit it with the righthand wheel to rotate to the right onto the shoulder. The wet grass shoulder would have had a co-efficient of friction of between .2 and .3. Barnwell testified that it was remarkable Mrs. Anding was able to get back on the highway after going off the shoulder and estimated that the Anding vehicle turned back onto the highway at an angle of less than 15 degrees, probably 8 to 10 degrees. He thought that Mrs. Anding then might have over-controlled her path to the left by steering right and lost control at the slick patch in the road. In Barnwell's opinion there was "a high possibility" (TR. 170) she could have maintained control of the car except for the presence of the slick patch. However, Barnwell testified that a vehicle crossing the patch without maneuvering would have encountered no difficulty, and the patch thus presented no general *695 hazard to the motoring public when driving straight ahead. Professor Barnwell confirmed that Clark would not have lost any speed coming down the grade by taking his foot off the throttle and the truck would have maintained its speed prior to the impact. Barnwell concluded that the absence of skidmarks from the truck and trailer indicated the brakes were not applied. Professor Barnwell testified that in his opinion the Clark truck was at least two feet over the center line and going in excess of 45 mph when the impact occurred. Professor Barnwell thought the gouge marks from the Ford were made after the impact as it ran up under the truck. In Professor Barnwell's analysis of the accident, the right front of the truck tore through the entire right front of the Anding vehicle where the principal damage was done. The Anding vehicle then spun counterclockwise against the west bridge railing, off the road and on to its final resting place. Barnwell identified a print of the bridge railing on the left side of the Anding car. The railing on the west side of the bridge had been repaired. Barnwell stated that the Anding vehicle would not have disturbed the forward motion of the Clark vehicle because of its light weight. The only effect of the Anding vehicle on the truck was to knock the right front wheel out from under it. Barnwell felt Clark could have stopped when he saw Mrs. Anding fishtail just as he came over the hill. The causes of the accident, in Barnwell's opinion, were the truck driving over the center line, the poor condition of the road shoulder and the slick pavement leading to the bridge.
Melvin L. Jackson, a 30-year employee of the Louisiana Department of Highways, is currently serving as assistant district engineer in charge of maintenance for the area in which the accident occurred. He formerly served as maintenance engineer, a job now held by his assistant. Jackson testified that the bridge and highway in question are maintained and owned by the Louisiana Department of Highways. At the time of this accident there were no signs warning of a narrow bridge, narrow road, soft shoulders or a highway slippery when wet. Jackson testified that the Department of Highways has rigs for skid tests but had not done any testing in this bridge area before the accident. The patch in question was put down in 1971.
Edward M. Wagner, Jr., head transportation engineer for the Louisiana Department of Transportation, testified that his job involves supervision and direction of traffic counts on the state's highways. His department's records showed 338 vehicles passing the accident site daily in 1976 and 281 in 1975.
Donald R. Marson, an engineer's aide with the Louisiana Department of Highways, testified that he ran an accident diagram for Louisiana Highway 399 between mile posts 5.5 and 5.9 where this accident occurred. No other accidents occurred there between January 1, 1973 and August 1, 1976.
James B. Butter, an engineer specializing in maintenance with the Louisiana Department of Highways, testified that he observed Louisiana Highway 399 between mileposts 5.5 and 5.9 on the day of this accident prior to its occurrence. He made no particular inspection or test in the area but noticed nothing unusual or apparently dangerous. Butter's notes for that day state that the patches on Highway 399 looked good. Butter added that patches are never put down without a top layer of aggregate, although a slick condition can result from sun bleeding the asphalt.
Wesley Sumler, parish superintendent for the Department of Highways, testified that Butter told him that he had checked Highway 399 on October 15, 1975. Subsequently this wreck was reported on that highway. A highway department crew was sent to put lights and signs to warn that the bridge railing was knocked off on the south side and to put sand on the diesel oil left by the truck. Sumler said the absence of gravel on the patch could have resulted from the asphalt coming to the top.
The trial court's conclusion that Clark's operation of the log truck and the condition of the road surface were both *696 causes of this accident has a reasonable evidentiary basis and is not manifestly erroneous. Factual causation is a question to be resolved by the trier of fact. Pence v. Ketchum, 326 So.2d 831 (La., 1976). Mrs. Anding testified that the truck was in her lane of traffic and, in Professor Barnwell's expert opinion, that was the case even at the point of impact. Mr. Clark testified that he was in his proper lane of traffic and this may have been the case, but the trial court had the prerogative of accepting the testimony to the contrary. The trial court's factual conclusion was that the truck was being driven across the center line and this "King Kong type vehicle" (TR. 159) intimidated and frightened Mrs. Anding. Mrs. Anding's attempts to cope with the emergency presented were hampered by the condition of the wet road. Her reaction to the emergency was to attempt to pull over to the side of the road. Clark observed this maneuver and regarded it as an attempt to get out of his way. Yet, Mr. Clark apparently made no attempt to stop or otherwise avoid the accident. Because of the uneven condition of the pavement edge, Mrs. Anding's right front wheel dropped off on the slick grassy shoulder. She then turned back to the highway and hit the slick section of asphalt about which Professor Barnwell testified.
The evidence does not establish that warning signs would have had any effect in this particular factual situation. The trial court did not state in reasons for judgment that their absence was a cause in fact, only that the Department was negligent in maintaining a slick surface without warning signs. There are no probative facts to support a conclusion that the absence of such signs was an additional cause in fact of the accident. Clark was completely familiar with the highway and had been over it earlier the same day under identical weather conditions. There is no evidence that Mrs. Anding could have done anything further to avoid the accident.
The trial court found that the condition of the Anding tires contributed to the occurrence of the accident and concluded that Leo Anding was negligent in equipping the automobile with slick tires. The duty of furnishing proper tires was found to rest solely with Mr. Anding. This finding is free of manifest error under these circumstances and bars recovery by Leo Anding. The negligence of a husband cannot be imputed to his wife. Carter v. Salter, 351 So.2d 312 (La.App. 3 Cir. 1977), writ denied, La., 352 So.2d 1045.
Mr. Clark was under a legal duty to drive his vehicle in its proper lane of traffic at a prudent speed in order to avoid colliding with an approaching vehicle such as that of Mrs. Anding. His breach of these duties created an emergency situation. Clark not only had a duty to drive his vehicle on the right side of the road but was under a further duty to attempt to avoid an accident or minimize its severity by stopping his vehicle if necessary. There is evidence that Clark did not attempt to avoid the accident. His actions were not those of a reasonably prudent driver. He was negligent: initially in driving across the center line of the road and later in failing to stop or slow his vehicle when he observed Mrs. Anding's perilous situation.
As to the Department of Highways, there is no evidence that the Department breached its duty to use reasonable care in inspecting and repairing its roadways and bridges. In contrast to Shively v. Pickens, 346 So.2d 1314 (La.App. 3 Cir. 1977) there were no other accidents in the area; the condition was not obviously dangerous; and there was no actual or constructive notice of a hazardous situation to the Department. No breach of duty by the Highway Department has been established. Even if the condition were conceded to be apparent, the Highway Department was not on notice of the fact. Parfait v. State Department of Highways, 334 So.2d 549 (La.App. 1 Cir. 1976), relied on by counsel for plaintiffs, involved a highway with a five or six inch drop off from the pavement to the shoulder and deep holes; the Department knew cars frequently ran off the road in the area. Also distinguishable from the instant factual situation is that presented in the recent *697 case of Barnes v. Liberty Mut. Ins. Co., 350 So.2d 288 (La.App. 3 Cir. 1977) where the Highway Department had notice of a potentially dangerous slippery condition from a prior accident and a state trooper's complaint. Here, we have only a corroded pavement edge, which did not appear dangerous to Butter or Trooper Beltz. According to Professor Barnwell's testimony, the patch did not present the type of apparent hazard which would constitute constructive notice to the Highway Department. Compare Robertson v. Handy, 354 So.2d 626 (La.App. 1 Cir. 1977) where a rut on the shoulder was 4" deep and 30 to 50 feet long.
Employees of the Department had patched the road but this alone did not create a defect. The evidence indicates that the patch may have become slick from the passage of time. It has not been established that the employees of the Department were negligent in their repair of the road, which had been inspected just prior to the accident.
It is contended that the Highway Department should be strictly liable as the owner of a dangerous thing, LSA-C.C. art. 2317. The principle of legal fault under this article, enunciated in Loescher v. Parr, 324 So.2d 441 (La., 1975), is that a party legally responsible for a thing which creates an unreasonable risk of harm to others can be held liable for resulting damage even though free of negligence. Fault of a third person is a defense to imposition of liability under this article. As pointed out at 37 La.L.R. 240, it is not clear in Loescher whether the fault of the third party must be the sole cause of damage or merely a contributing factor. Here, the causes of the accident included the wet, slippery highway as well as the negligence of third party Clark. In American Road Ins. Co. v. Montgomery, 354 So.2d 656 (La.App. 1 Cir. 1977), writ denied 356 So.2d 430 (La., 1978), another circuit concludes that any third party fault bars liability. Despite the denial of writs, we are not convinced this holding is correct. This circuit in Gallien v. Commercial Union Ins. Co., 353 So.2d 1127 (La.App. 3 Cir. 1977), writ denied 354 So.2d 1379 (La., 1978), held that, despite Loescher, actual or constructive notice is still required for a public body to be held liable as the owner of a thing presenting an unreasonable risk of harm to others.
The Louisiana Supreme Court decided in U.S.F. & G. Co. v. State, Dept. of Highways, 339 So.2d 780 (La., 1976) that the Highway Department had actual notice of a serious hazard and therefore did not discuss liability under LSA-C.C. art. 2317.
We conclude that the Highway Department maintained Highway 399 in a reasonably safe condition. Moreover, analyzed in the context of Loescher, Highway 399 did not present an unreasonable risk of harm to the ordinary prudent motorist. The highway became hazardous only when Mrs. Anding was presented with an emergency situation.
There is a reasonable evidentiary basis for the trial court's conclusion that Mrs. Anding was not negligent. She was faced with a sudden emergency and her response to it was reasonable. A party in such a situation is not required to make the best possible choice of alternatives. The evidence is sufficient to rebut the presumption that Mrs. Anding was at fault in allowing her vehicle to cross the center line of the highway prior to the collision.
The evidence as to damages was as follows:
Bruce Wayne Cole, an ambulance attendant in Pitkin, said Tonya had no pulse or respiration so he left her at the scene; Ms. Anding and Cody were put in his ambulance. Another ambulance took Tonya directly to a funeral home. Cody was described as exhibiting considerable pain; crying, frightened and vomiting. Mrs. Anding had lacerations on her legs, was scalped and said she had no feeling from her waist down. It was stipulated that the testimony of Sid Cole would confirm that of Bruce Cole. James Carlin Johnson of Pitkin arrived at the scene shortly after the accident while Mrs. Anding and the children were present and gave a substantially similar description of their condition.
*698 Tonya was born January 30, 1970 and was five years old at the time of her sudden traumatic death. Her father, George Anding, said she was a leader in her kindergarten and described her as an outdoor girl who enjoyed boating and fishing with him. The parents, George and Gwendolyn, were separated and have since been divorced. George Anding has another daughter by his present marriage but Gwendolyn Anding does not. Gwendolyn depicted Tonya as exceptionally bright, active and outgoing. Cody, born November 16, 1971, was four at the time of the accident. Cody and Tonya divided their time between their maternal and paternal grandparents; George and Gwendolyn were also staying with their respective parents in Pitkin. Gwendolyn had legal custody of the children, but George saw them every day.
Although Cody was not permanently injured, the trial court noted that he suffered mental pain and suffering disproportionate to his physical injuries.
When George went to the Beauregard Hospital to check on Cody's condition, he found him scared, hurt and vomiting blood with bruises on his shoulder, cuts on his head and a hole about the size of a pencil in his leg. When Gwendolyn Anding went to the hospital, she also found Cody in shock, frightened, crying and throwing up blood. It was three or four weeks before Cody resumed his normal play. According to Gwendolyn, Cody and Tonya were inseparable until she started school and Cody had an extremely bad time after the accident. He was described as back to normal at the time of trial in February and March, 1977.
The awards of $35,000 to the father of Tonya and $40,000 to the mother of Tonya plus various special damages are within the much discretion accorded the trial court. The same is true of the $5,000 award to Gwendolyn Anding for the use and benefit of George De Cody "Cody" Anding. LSA-C.C. art. 1934.
Mrs. Anding's medical expenses totaled $14,394.52. She now has to have friends and relatives do her housework, spends most of her time in a wheelchair and uses a walker to get around. Her driver's license was lost in the accident and she has not secured another one because she has no use for it. She was 51 at the time of trial and the trial court found her life expectancy under LSA-R.S. 47:2405 to be 20.20 years. Her right kneecap was removed as the result of the accident and her pelvis, hip, shoulder and ribs were fractured. She said her left index finger is now useless as the result of a mallet type fracture. The court examined a scar around Mrs. Anding's head which was likened to a skull cap in appearance. Mrs. Anding testified to discomfort as a residual of the scalp injury and pain in her pelvis, hip and knee. She was hospitalized for three months.
Dr. C. W. Lowery testified as an expert in orthopedic surgery that he saw Mrs. Anding in the St. Frances Cabrini emergency room after initial evaluation by a Dr. Brown in DeRidder where Mrs. Anding received sedation, had her scalp sutured in place and an i.v. started. The compound fracture inside the patella had been cleansed and loosely closed with one suture. X-rays showed multiple rib fractures: 2 through 8 on the left; and 3 through 5 on the right. The ribs had apparently punctured the lung. X-rays also revealed a comminuted, intra-pelvic hip fracture, a comminuted patella fracture, a fracture of the right clavicle and a mallet deformity of the left index finger. Dr. Smith, a cardiovascular surgeon in Alexandria, was called into consultation. Various supportive care was undertaken and Mrs. Anding was taken to the intensive care unit. The kneecap was later removed. Mrs. Anding continued to have a separation of the clavicle which did not heal, but surgery was not undertaken because of her other problems. Her left index finger was splinted for about two months and she stayed in traction until the pelvic fractures healed. She remained in intensive care until October 27th and was discharged from the hospital in an ambulance on January 14, 1976. She continued under the care of Dr. Lowery, who last examined her on November 24, 1976. Dr. Lowery testified that there is a very strong *699 probability that Mrs. Anding will require a total hip replacement within five years. She has 50% impairment of the lower extremity from the pelvic fracture and 30% impairment from the kneecap removal with lower extremity permanent impairment as a whole of almost 80%; non-union of the clavicle results in approximately 35% permanent disability of the upper extremity as a whole. Dr. Lowery stated that Mrs. Anding is unemployable and will need assistance in doing normal household duties, even with total hip replacement. Dr. Lowery testified that she will be confined to a wheelchair or walker for the rest of her life.
Dr. Curt H. Smith testified as an expert in surgery that he was asked to consult with Dr. Lowery about Mrs. Anding because of her severe multiple injuries. Dr. Smith first saw Mrs. Anding in the intensive care unit on the evening of the accident. Although she had received morphine shots, she was coherent, conscious and complaining of pain. Her blood pressure indicated shock and Dr. Smith advised against immediate surgery. Observation for three days ruled out internal injuries which would have taken precedence over her orthopedic difficulties.
The award of $200,000 to Ora Mae Anding is within the discretion of the trier of fact and is neither excessive nor inadequate. LSA-C.C. art. 1934.
For the foregoing reasons, the judgment of the trial court herein is reversed insofar as it awards plaintiff, Ora Mae Anding, judgment against the State of Louisiana through the Department of Highways and insofar as it awards the State of Louisiana through the Department of Highways judgment for contribution.
The judgment of the trial court is otherwise affirmed. All costs at trial and appeal are assessed against defendants-appellants, Southwestern Insurance Company and Clyde Ellis Clark.
REVERSED IN PART; AFFIRMED IN PART.
GUIDRY, J., concurs.
NOTES
[*] Guidry, J., voted to grant a rehearing limited to the issue of whether Ora Mae Anding was guilty of negligence which was a legal cause of the accident.